**SIERRA CLUB et al., Appellants,**

v.

**Rogers C. B. MORTON, Secretary of the United States Department of the Interior, et al.**

**No. 74–1389.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 17, 1974.

Decided June 16, 1975.

---

---

*Syllabus by the Court*

Appellants, environmental groups suing on behalf of themselves and their members, sought declaratory, injunctive, and mandamus relief against appellees, the Departments of the Interior, Agriculture, and the Army, requiring them to prepare a comprehensive regional environmental impact statement before allowing development of the Northern Great Plains, encompassing eastern Montana, northeastern Wyoming, and the western Dakotas, one of the world's richest coal basins. *Held:* Major federal action is contemplated in the Northern Great Plains, but it is uncertain whether the proposal for such action is sufficiently ripe to require preparation of an impact statement at this time. The case is remanded to the District Court to allow

appellees, in the first instance, to make that decision.

1. It is clear that a comprehensive impact statement is required for "broad agency programs" as well as for "particular facilities." Scientists' Institute for Public Information, Inc. v: AEC (SIPI), 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973). The courts will look beyond agency denials to see if, in fact, a "broad agency program" is under way or proposed. *Infra*, 169 U.S.App.D.C. at ——, ——, 514 F.2d at 870–875.

2. Here appellees' course of conduct and public statements over the past five years, as well as the findings of the District Court, prove beyond doubt that a broad agency program, regional development of the Northern Great Plains, is contemplated and that plans for controlling that development are being formulated. *Infra*, 169 U.S.App.D.C. at —— ——, 514 F.2d at 875–878.

3. While federal officials are entitled to dream out loud without filing an impact statement, a statement is required when a proposal moves beyond the "dream" stage into some tangible form of sufficient ripeness. The standard of ripeness is low because the statement should be prepared before irretrievable commitments are made or options precluded by agency action. The statement is designed to aid agency decision-making, not to provide *ex post facto* justification for it. *Infra*, 169 U.S.App. D.C. at —— ——, 514 F.2d at 878–880.

4. Four balancing tests are adopted from *SIPI* to determine if the time is ripe for an impact statement. Application of those tests in this case produces an uncertain result. Since certain dispositive elements of the balancing test, now uncertain, are about to be resolved, the case is remanded to the District Court to allow appellees initially to decide whether an impact statement is now necessary. *Infra*, 169 U.S.App.D.C. at —— ——, 514 F.2d at 880–882.

5. On remand, appellees must report to the District Court the present posture of their plans for development of the Northern Great Plains and their decision regarding the present need for an impact statement. Appellants will be able to challenge appellees' decision. *Infra*, 169 U.S.App.D.C. at —— ——, 514 F.2d at 882–883.

6. This court's limited temporary injunction is continued pending appellees' decision. Adoption by appellees of a policy of restraint with regard to development of the Northern Great Plains pending ultimate decision and preparation of a comprehensive impact statement may make enlargement of the injunction unnecessary. *Infra*, 169 U.S. App.D.C. at —— ——, 514 F.2d at 883.

The District Court's grant of summary judgment for appellees is reversed and this case is remanded for further proceedings not inconsistent with this opinion.

MacKinnon, Circuit Judge, filed the dissenting opinion.

Bruce J. Terris, Washington, D. C., with whom Suellen T. Keiner, Washington, D. C., was on the brief, for appellants.

Jacques B. Gelin, Atty. Dept. of Justice, with whom Wallace H. Johnson, Asst. Atty. Gen., and Raymond N. Zagone and Herbert Pittle, Attys., Dept. of Justice, were on the brief, for appellee Morton. Edmund E. Clark, Atty., Dept. of Justice, also entered an appearance for appellee Morton.

Francis M. Shea, Washington, D. C., with whom Richard T. Conway, David Booth Beers, Washington, D. C., and William H. Coldiron, Butte, Mont., were on the brief, for appellees Montana Power Co., Portland General Elec. Co., Puget Sound Power & Light Co., and Washington Water Power Co., and also argued on behalf of all other appellees.

Richard M. Merriman, Peyton G. Bowman, III, and James K. Mitchell, Wash-

ington, D. C., were on the brief for appellees Arkansas Power & Light Co., Oklahoma Gas & Elec. Co., and Wisconsin Power & Light Co.

Henry B. Weaver and John E. Nolan, Jr., Washington, D. C., were on the brief for appellee Atlantic Richfield Co. Frank B. Friedman, Los Angeles, Cal., also entered an appearance for appellee Atlantic Richfield Co.

James W. McDade, Washington, D. C., was on the brief for appellee Peabody Coal Co.

Justin R. Wolf, Charles A. Case, Jr., and David B. Ward, Washington, D. C., were on the brief for appellee Northern Natural Gas Co.

Robert L. Ackerly and Joseph S. Wager, Washington, D. C., were on the brief for appellee Panhandle Eastern Pipe Line Co.

Peter J. Nickles, Washington, D. C., was on the brief for appellees American Elec. Power System and Kerr-McGee Corp.

Stuart T. Saunders, Jr., William A. White, Washington, D. C., and George J. Miller, Philadelphia, Pa., were on the brief for appellee Westmoreland Resources. Max Wilfand, Washington, D. C., also entered an appearance for appellee Westmoreland Resources.

John D. Ross was on the brief for appellee Crow Tribe of Indians. L. Graeme Bell, III, Washington, D. C., also entered an appearance for appellee Crow Tribe of Indians.

Dale A. Wright and Harold L. Talisman, Washington, D. C., were on the brief for appellee Cities Service Gas Co.

Max N. Edwards, Washington, D. C., was on the brief for appellee McDonough.

Before BAZELON, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge MacKINNON.

J. SKELLY WRIGHT, Circuit Judge:

Appellants brought suit in District Court seeking declaratory judgment, injunction, and mandamus against the federal appellees, the Departments of the Interior, the Army, and Agriculture, alleging that appellees had violated Section 102(2) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2), by allowing development of coal resources in the Northern Great Plains without issuing a comprehensive environmental impact statement (EIS) for the region. We must decide whether appellees' attempts to control development of coal resources in four western states constitute a major federal action within the meaning of Section 102(2), and, if so, whether those attempts are sufficiently developed to require the filing of a comprehensive regional impact statement. Answering the first question in the affirmative, we reverse the District Court's grant of summary judgment for the federal appellees and remand this case to give the federal appellees the opportunity to decide the second.

I

The Northern Great Plains Province (the Province), which covers northeastern Wyoming, eastern Montana, western North Dakota, and western South Dakota, and extends southerly through strips of Nebraska and Colorado, is one of the world's richest basins of relatively untapped coal reserves.[1] Most of the coal in the Province is located in the Fort Union and Powder River formations, which occupy the four northernmost states. The coal resting under those plains is highly desirable because it is of low sulphur content, which makes it environmentally preferable, and because it is relatively close to the surface, which

---

**1.** Sixty-three counties in Wyoming, Montana, and North Dakota hold 48% of the nation's total coal reserve. Northern Great Plains Resources Draft Interim Report (hereinafter NGPRP Draft Interim Report) at III–1.

makes it readily accessible by strip mining. Since some 85 per cent of the nation's low-sulphur coal reserves is located on public land under the jurisdiction of the Secretary of the Interior, prudent development of this valuable national asset is largely subject to federal initiative and control. In recent years, as concern about greater national self-sufficiency in energy matters has mounted, steps toward such development in the Province have been taken. But while the coal reserves of the Province are in great demand, both over the long and the short term,[2] the massive development of the area necessary to secure, utilize, and deliver those resources necessarily entails broad environmental consequences. In addition to the obvious environmental effects of strip-mining acres of now-fertile land, development would also affect the region's water supply and quality, air quality, wildlife, population distribution and composition, and economic structure. These effects would be caused not only by the mines themselves, but by the power plants, coal gasification plants, railroads, aqueducts, pumping plants, reservoirs, dams, and new housing that would necessarily accompany the strip mines.

Needless to say, such development under federal auspices demands compliance with NEPA's dictate than an impact statement accompany all proposals for "major Federal actions significantly affecting the quality of the human environment * * *." Section 102(2)(C), 42 U.S.C. § 4332(2)(C).[3] See generally Scientists' Institute for Public Information, Inc. v. AEC (SIPI), 156 U.S.App. D.C. 395, 481 F.2d 1079 (1973); Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972); Greene County Planning Board v. FPC, 2 Cir., 455 F.2d 412 (1971), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App. D.C. 33, 449 F.2d 1109 (1971). The Secretary of the Interior has shown concern over developing the coal reserves of the Province in a responsible manner consistent with NEPA.[4] NEPA, he recognized,

---

2. For at least the short term, increased use of coal is said to be the best way to ward off an energy crisis. Affidavit of Ralph E. Lapp, Ph.D., App. 286. Over the long term, at present energy growth rates the nation's need for coal will triple by the year 2000. Brief of federal appellees at 6.

3. In pertinent part, § 102(2) of NEPA, 42 U.S.C. § 4332(2) (1970), provides:

[A]ll agencies of the Federal Government shall——

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

* * * * * *

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on——

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to the environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources[.]

4. There are currently 14 mining leases in operation in the Province (four in Montana, six in

might demand comprehensive development of the Province and a more comprehensive analysis of environmental impact therein than would be produced by impact statements designed for individual mines. Thus on May 26, 1970 the Secretary initiated the North Central Power Study, an attempt to coordinate energy development throughout the North Central States. While unfavorable private response to the Study resulted in its termination, Finding of Fact (Fdg.) 13, Appendix (App.) 237, the Secretary continued to acknowledge that development should be based upon comprehensive, rather than piecemeal, action. Affidavit of Secretary Morton, App. 194. Accordingly, on June 30, 1972 he ordered a massive federal-state inter-agency study, now known as the Northern Great Plains Resources Program (NGPRP), to assess the potential social, economic, and environmental impacts that development of the Province would cause. Secretary Morton wrote to his Assistant Secretaries:

> The vast reserves of coal in the Fort Union Region of Montana, North Dakota, South Dakota and Wyoming provide an excellent opportunity for this Department to demonstrate how a responsible Federal agency can manage resource development with proper regard for environmental protection. It is important that we not lose this opportunity by engaging in single-purpose studies which are incapable of developing comprehensive information or

by taking piecemeal actions which restrict our future options.

App. 73. The NGPRP was designed to "coordinate on-going activities and build a policy framework which might help guide resource management decisions in the future." News Release, Oct. 3, 1972, App. 201. Pending its completion, the Secretary suspended a project, the Montana-Wyoming Aqueducts Study, designed to assess the availability of water for development of the vast coal resources. Fdg. 17, App. 194.

In addition to concern about development of the Province, the Secretary was also concerned about national development of a coal-leasing policy.[5] In early 1973 he determined that a national impact statement on proposed federal coal leasing was necessary, and that pending issuance of this coal programmatic statement, no coal leases would be issued except pursuant to a short-term coal-leasing policy announced to the public on February 17, 1973.[6] News Release, Feb. 17, 1973, App. 196; Affidavit of Secretary Morton, App. 191; Fdgs. 15–18, App. 237–239. The purpose of the coal programmatic statement, now in draft form, is "to provide a national overview of the impact of the entire Federal coal leasing program on the quality of the human environment." Affidavit of Secretary Morton, App. 191; Fdg. 15, App. 237–238. It will supplement, as necessary, "appropriate impact reporting on a regional basis or for individual leases." News Release, Feb. 17, 1973, App. 197.

North Dakota, four in Wyoming) covering a total of 90,000 square miles. Fdgs. 8, 11, App. 235, 236. All are operating under federally-approved mining plans and under state-approved reclamation plans. *Id.* While it is not clear from the District Court findings, it appears that all of these leases were issued, and the mining plans approved, prior to the effective date of NEPA.

The Government has also issued coal prospecting permits covering federal lands and four Indian reservations. Fdg. 10, App. 236.

5. Since the enactment of the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq. (1970), federal coal lands have been available for leasing only, rather than for sale.

6. The suspension policy does not apply to federal approval of coal leasing plans on Indian lands. In fulfillment of its fiduciary responsibilities over those lands, the Department of the Interior will approve leases where the tribal or individual Indian landowner desires to dispose of the minerals, where the terms and conditions of the lease are in the best interest of the Indian landowner, where appropriate environmental safeguards are imposed on the lessee, and where NEPA's requirements have been met. Affidavit of Secretary Morton, App. 193; *see* App. 199; Fdg. 22, App. 240. Since the national coal leasing suspension order of Feb. 17, 1973, however, the Department has not approved any coal leases on Indian lands within the Province. Supp. Fdg. 3.

Besides suspending issuance of leases, the Secretary also determined to suspend issuance of any coal prospecting permits until further notice. Secretarial Order 2952, February 13, 1973, App. 198.

While these suspension policies are nationwide, they apply only to federal approval of mine leases and prospecting permits. As was suggested above, however, development of the Northern Great Plains to accommodate the coal mines is not so limited in scope. In recognition of the broader, yet inescapably environmentally related, activities accompanying coal development, the Secretary has sharply restricted federal approval of any related action in the Province pending issuance of the NGPRP interim report. According to Secretary Morton,

> the granting or approval of leases, special use permits and all types of rights-of-way across public lands, the delivery and sale of water and approval of mining plans relating to coal development in the Northern Great Plains will be held in abeyance pending the availability of the interim report from the NGPRP study or submitted to the Under Secretary for review and concurrence prior to execution.

Affidavit of Secretary Morton, App. 194; see Fdg. 25, App. 241. The draft interim NGPRP report was issued September 27, 1974, Supp. Fdg. 5, and the final interim report is expected to issue in February 1975. Answer of Secretary Morton to Plaintiff's Revised Supp. Interrogatories, Ans. No. 24 (hereinafter Supp. Int. to Secretary Morton).

Despite Interior's announced moratorium on leases, prospecting permits, and other activities subject to its approval in the Province, some federal activity continues in the Northern Great Plains. Other federal agencies, all appellees here, are to some extent responsible. The Department of Agriculture has jurisdiction over issuance of rights-of-way over lands within the national forests, and the Army Corps of Engineers has jurisdiction over the navigable rivers. While both agencies refused to consider applications for permits or rights-of-way prior to June 30, 1974, they are now both accepting applications and willing to grant them. Agriculture has received four applications for rights-of-way over lands in the Northern Great Plains within the national forests,[7] and the Corps of Engineers has pending one application for a right-of-way over navigable rivers within the region.[8] Moreover, since June 30, 1974 the Corps has issued two permits for structures in the navigable waters within the Northern Great Plains,[9] and has pending two applications for such permits.[10]

More importantly, the announced restrictions placed by Interior on development of the Province have some large loopholes through which federal activity can proceed. In summary form, they are as follows: (1) the short-term leasing program applies only to new leases and does not interfere with the Department's ability to approve mining plans for pre-existing leases in the area; (2) some leases may be issued under the short-term leasing policy itself; and (3) feder-

---

**7.** All four applications are for rights-of-way over the Thunder Basin National Grasslands in Wyoming: by Wycoalgas Co. (water transmission line right-of-way); Rochelle Coal Co. (conveyor belt right-of-way); Atlantic Richfield Co. (plant site and railroad spur right-of-way); and Rochelle Coal Co. (railroad spur right-of-way). No action will be taken on any of these applications until the Forest Service of the Department of Agriculture determines whether an impact statement is necessary. If so, of course, no action will be taken until the impact statement is completed. Supp. Fdg. 4.

**8.** The pending application is from the Minnkota Power Corp. for a transmission line crossing

the Missouri River near Price, North Dakota. *Id.*

**9.** Permits were issued to the following: Square Butte Electric Co. (water intake structure for generating plant cooling near Bismarck, North Dakota, issued Sept. 23, 1974); Ottertail Power Co. (removal of water intake structure for abandoned power plant near Washburn, North Dakota, Issued Oct. 15, 1974). *Id.*

**10.** Pending applications are from: Michigan-Wisconsin Pipeline Co. (water intake structure for coal gasification plant near Beulah, North Dakota); Consolidated Development Co. (water intake structure out of Oahe Lake for multiple purposes). *Id.*

al activity in the Province is not really suspended pending issuance of the NGPRP, but rather can continue upon the approval of the Under Secretary. The first and third of these loopholes are the largest. In the states of Wyoming, Montana, North Dakota, and South Dakota (the four-state area),[11] there are 95 outstanding leases with a total acreage of 196,652 acres not subject to an approved mining plan; likewise there are nine outstanding leases on Indian lands with a total of 76,650 acres. Supp. Int. to Secretary Morton, Ans. No. 14. Mining plans can be approved for these leases, and mining can begin thereon, upon the concurrence of the Under Secretary.[12] Since the short-term leasing policy began, at least four mining plans, one on Indian lands,[13] have been approved, and approval of four more mines in the Eastern Powder River coal basin is pending.[14] Environmental impact statements have been issued for most of these plans.[15] Approval is pending as well for eight other mining plans, one of which covers Indian lands, in the four-state area. Supp. Int. to Secretary Morton, Ans. No. 16. In addition to ongoing approval of mining plans, Interior has previously approved plans for 29 leases issued by the Bureau of Land Management (BLM), only half of which are operational.[16] These mines can begin operation without further federal action.

Moreover, despite the short-term leasing program, there are exceptions to the leasing moratorium. The program allows a lease to be issued

(a) When coal is needed now to maintain an existing mining operation; or

(b) When coal is needed as a reserve for production in the near future;

11. Some of the interrogatories are addressed to this four-state area rather than to the precise confines of the Province. See Supp. Int. to Secretary Morton. While another coal region, the Rocky Mountain Province, covers parts of Montana and Wyoming, there is no reason to suppose that the data thus presented is not useful for assessing, at least in a qualitative way, activity within the Northern Great Plains.

12. Interior must act affirmatively at three points before a mine can begin operations. First, it must issue a prospecting permit, which usually contains a preference right to any subsequent lease. Second, it must issue a lease. Finally, it must approve a mining plan. The first activity is now suspended, the second governed by the short-term leasing policy, and the third continues unimpeded.

13. Mining plans have been approved for leases held by the Amxas Coal Company in Campbell County, Wyoming (72 acres); Peabody Coal Company in Rosebud County, Montana (640 acres); Western Energy in Rosebud County, Montana (150 acres); and Westmoreland Resources in Harden County, Montana (245 acres). The Westmoreland lease is on Indian lands. Supp. Int. to Secretary Morton, Ans. No. 15.

14. Approval is pending of mining plans submitted by Atlantic Richfield Company, Carter Oil Company, Kerr-McGee Coal Corp., and Wyodak Resources Development Corp. While the Secretary has indicated his readiness to act on these plans, Supp. Int. to Secretary Morton, Ans. No. 31, action has been stayed by order of this court, pending resolution of this appeal. Order filed Jan. 3, 1975.

15. Impact statements have been issued for the plans submitted by Westmoreland Resources, Peabody Coal Company, and the four mines in the Eastern Powder River basin. See notes 13 & 14 supra. The validity of the Westmoreland statement was sustained in Redding v. Morton, Civ.No. 74–12–BLG (D.Mont., May 1, 1974), appeal pending, 9th Cir., No. 74–1984. The Eastern Powder River mines were considered together in one impact statement so that the cumulative effect of these related development plans could be analyzed. To assure full consideration of total impact, the statement also considered the proposed issuance of a railroad right-of-way to Burlington Northern Inc. and the Chicago and North Western Transportation Company for a new railroad route between Gillette and Douglas, Wyoming to service the new mines. The final environment statement was issued to the Council on Environmental Quality (CEQ) on Oct. 18, 1974.

There has been no contention that any of these individual statements comprehensively study the regional impact of coal development in the Northern Great Plains, and our examination of the statements makes it clear that they do not do so. Cf. Scientists' Institute for Public Information, Inc. v. AEC (SIPI), 156 U.S.App.D.C. 395, 408–409, 481 F.2d 1079, 1092–1093 (1973); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 12–13, 458 F.2d 827, 834–835 (1972). See also notes 23 & 36 infra.

16. See note 7 supra.

(c) When the land to be mined will in all cases be reclaimed in accordance with lease stipulations that will provide for environmental protection and land reclamation; and

(d) When an environmental impact statement covering the proposed lease has been prepared when required under the National Environmental Policy Act.

News Release, Feb. 17, 1973, App. 196–197; Fdg. 18, App. 238–239. Since institution of the program, four leases have been issued throughout the nation, although none are in the Northern Great Plains. Supp. Fdg. 1. Nonetheless, there are 42 competitive lease applications pending in the four-state region for a total of 272,126 acres, and 80 preference right leases pending in the region for a total of 201,668 acres. Supp. Int. to Secretary Morton, Ans. Nos. 7 & 8. Interior has proved willing to apply the exception to the leasing moratorium in the Northern Great Plains. On July 9, 1974 the Department offered for sale a lease covering approximately 320 acres south of Stanton, North Dakota. The lease was not issued only because no bids were received. Supp. Int. to Secretary Morton, Ans. No. 2. Despite the number of pending applications, however, Interior says it is not now considering offering any further leases in the Province under the short-term leasing program. Id., Ans. No. 3. The Secretary anticipates that the short-term leasing program will continue in effect "at least until after the issuance of the final coal programmatic EIS and the development of a planning system to determine the size, timing and location of future coal leases.[17] Id., Ans. No. 4. The final coal programmatic statement is expected to issue shortly. Id., Ans. No. 30.

Lastly, Interior has power over development of projects in the Northern Great Plains that are very closely tied to any future development of the Province's coal resources. These powers are not affected by the short-term coal-leasing policy, and are limited only by the Secretary's stated forbearance pending issuance of the NGPRP, a forbearance that evaporates upon the Under Secretary's approval of a stated project. Thus, in addition to the pending mining plans discussed above, there are now pending before the Department 14 applications for coal-related rights-of-way across the Northern Great Plains. Id., Ans. No. 21. Two coal-related rights-of-way have been granted since June 30, 1974 in the four-state region, but both are outside the Northern Great Plains. Id., Ans. No. 20. Additionally, a total of 41 applications are now pending before the Department, the Corps of Engineers, or both, for option contracts for water in the Province, although no such contracts have been executed since July 1971.[18] Well over two million acre feet of annual water use are at stake. Supp. Fdg. 7.

In sum, there are pending applications for mine leases and mining plans, for rights-of-way over public lands, navigable waterways, and national forests, and for water rights in federally-controlled waters throughout the Northern Great Plains. Few such applications have been granted in the last two years as the Secretary has studied the preferred development of the region. Yet the time when action will be taken is close at hand. The final coal programmatic EIS and the final interim report of the NGPRP will issue shortly, if they have not issued already. The flood of applications will then be ripe for approval, and the massive development of the Northern Great Plains will begin.

II

Plaintiffs-appellants are a collection of organizations interested in protection of

---

**17.** *Cf.* Hearings before the Subcom. on Minerals, Materials, and Fuels of the Senate Committee on Interior and Insular Affairs, 93rd Cong., 2d Sess. 10, 17, 28 (1974) (statement of Ass't Sec. of Interior Horton that Department will end its short-term leasing policy in Sept. 1974).

**18.** One such application was denied in Sept. 1973. Supp. Fdg. 7.

the environment. They brought suit on behalf of themselves and their members, *see* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), on June 13, 1973, charging that the Departments of the Interior, Agriculture, and the Army (the federal appellees) had authorized development of coal resources in the Northern Great Plains Region (the Region), defined as northeastern Wyoming, eastern Montana, and the western Dakotas, in violation of NEPA. Specifically, appellants charged that NEPA precluded development of the Region except after preparation of a comprehensive environmental impact statement, systematic interdisciplinary studies of coal development, and a study of appropriate alternative courses of action. 42 U.S.C. § 4332(2)(A), (C), and (D). Appellants sought a declaratory judgment that NEPA was being violated, an injunction barring future federal action in the Region until the requirements of NEPA were met, and an order compelling the federal appellees to comply with NEPA. Complaint at 22–23, App. 22–23. A number of coal mining companies, utility companies, and the Crow Tribe of Indians (the intervenor appellees), all having interests in development of the Province, were allowed to intervene as defendants.

After limited discovery appellants moved, on August 31, 1973, for summary judgment. App. 66. The federal and intervenor appellees filed various cross-motions for summary judgment and judgment on the pleadings. App. 164, 168, 171. On February 14, 1974 the District Court denied appellants' motion for summary judgment and granted appellees' motions. While finding, and reciting most of the facts outlined above, *see supra*, 169 U.S.App.D.C. at —–—, 514 F.2d at 861–866, the District Court concluded that the Region, as defined in appellants' complaint, "is not an entity, region, or area which has been defined by the Federal Government by statute or executive action for purposes of any Federal program, project, or action." Fdg. 7, App. 235. Moreover, despite the facts outlined above, "[t]here

is no existing or proposed Federal regional program, plan, project, or other regional 'federal action' *within the meaning of NEPA Section 102(2)* for the development of coal or other resources" in the Region. Fdg. 8, App. 235 (emphasis in original). The court then held that in the absence of regional federal action, multiple applications for individual federal action in connection with individual private projects which are unrelated to one another except geographically do not either constitute regional federal action or mandate a regional impact statement. Conclusion of Law (Concl.) 4, App. 245. Likewise, NEPA Sections 102(2)(A) and (D) do not require a regional approach unless the federal action subject to those requirements is already regionally based. Concl. 5, App. 246. Finally, the court ruled that the NGPRP "is a study project and not a program for development," and, as such, it does not "ha[ve] life" within the meaning of NEPA. Concl. 9, App. 248. Even if a regional plan existed, the court ruled, NEPA would not prohibit proceeding with individual projects and, in any case, appellants would not be entitled to an injunction since they have not shown the likelihood of irreparable harm. Concl. 10 & 11, App. 248.

Appellants filed their notice of appeal on March 19, 1974. On March 26, 1974 the District Court denied appellants' motion for an injunction pending appeal, and appellants then filed, on April 12, 1974, a motion in this court for an injunction pending appeal and an expedited hearing. The motion for an expedited hearing was granted on June 17, 1974. While the court, Leventhal and Tamm, JJ., denied the motion for the broad injunction pending appeal because it lacked adequate knowledge of certain dispositive facts, it noted "the spectre of significant harm to large tracts of valuable wilderness still remains," and it urged the federal appellees to exercise "substantial restraint" in continuing development of coal resources in the Region lest the court's jurisdiction to decide

the need for a comprehensive impact statement be, for all practical purposes, defeated. Order filed June 17, 1974.

 Argument was scheduled for mid-October, but on October 14, 1974 the court, Leventhal and Nichols, JJ., ordered, *sua sponte*, argument rescheduled for December 17, 1974, meanwhile remanding the record to the District Court for a further evidentiary hearing designed to answer certain factual questions so as to make the record as current as possible.[19] The parties were allowed to file supplemental memoranda concerning the District Court's supplemental findings. The District Court has provided us with full answers to the certified questions, but has adhered to its original conclusions of law. Thus we may deem the court to have found these additional facts not inconsistent with its original conclusion. After oral argument we granted appellants' motion for a limited injunction pending this decision, and ordered the Secretary of the Interior, pending further order, to take no action concerning the mining plans and railroad rights-of-way ready for approval in the Eastern Powder River coal basin and discussed in the Eastern Powder River EIS. Order filed January 3, 1975. Having the benefit of the District Court's original and supplemental findings, and the original briefs and supplemental memoranda of the parties, we must now turn to the merits.[20]

19. The supplemental questions were as follows:

1. Is the limitation on the issuance by the United States of coal leases announced on February 17, 1973, still in effect? How many leases have been issued for lands in the Northern Great Plains region since February 17, 1973?

2. Is the suspension of the issuance by the United States of coal prospecting permits announced on February 13, 1973, still in effect? How many, if any coal prospecting permits have been issued in the Northern Great Plains region since February 13, 1973?

3. To what extent has coal leasing on Indian lands in the Northern Great Plains region been approved by the Department of the Interior since February 17, 1973?

4. Have any applications for permits for rights-of-way over lands within national forests in the Northern Great Plains region been considered or acted upon by the Department of Agriculture since June 30, 1974? Have any applications for permits for rights-of-way over navigable rivers in the Northern Great Plains region been considered or acted upon by the Corps of Engineers since June 30, 1974?

5. Has the Northern Great Plains Resources Program interim report been released? Is any further action contemplated regarding that program?

6. Does the United States Government contemplate the preparation of any future environmental impact statements—other than statements for individual projects—for the Northern Great Plains area, the Fort Union Formation, or for any subregion thereof?

7. What is the status of the granting of water rights and water contracts in the Northern Great Plains area?

8. How was the area to be covered by the EIS for the development of coal resources in the Eastern Powder River Coal Basin defined, and how was it determined that an EIS was appropriate for that area?

9. Regarding environmental empact statements for individual projects in the Northern Great Plains area, where the statements have been issued after February 17, 1973, or prepared for projects that were commenced, after that time—

a. Provide one or more representative statements.

b. Do the statements attempt to provide an assessment of the cumulative impact of the governmental action in the surrounding area?

c. Do the statements take into account the ecological setting created by private action in the area?

d. Has the government devised any procedure for cross-referencing among the individual statements?

Order, Oct. 14, 1974.

20. We can dispose here of two preliminary defenses raised by appellees and given credence by the District Court, namely, whether this case presents a justiciable case or controversy, and whether appellant organizations have standing to sue. The District Court held that "the courts will not review the validity of supporting statements or studies until final Federal actions taken under NEPA Section 102(2) and until after final agency action has been taken with respect to the individual project," Concl. 7, App. 247, and that, therefore, no case or controversy had been stated. Concl. 8, App. 247. While the court is correct that as a general proposition of law NEPA challenges to individual projects can be brought only after final agency approval of a

project, *see e. g.*, Committee to Stop Route 7 v. Volpe, D.Conn., 346 F.Supp. 731 (1972), the court seems to assume that (1) only individual actions can be challenged, and (2) appellants do not allege that final actions have occurred. Both of these assumptions are erroneous, and we find that appellants have stated a case or controversy.

First, as will be made clear in text below, *SIPI* firmly holds not only that a comprehensive program can be challenged under NEPA, but that the suit does not have to be brought via an attack on an individual action. Even though the AEC's Liquid Metal Fast Breeder Reactor (LMFBR) program was only in "the research and development stage and no specific implementing action which would significantly affect the environment had yet been taken," *SIPI, supra* note 15, 156 U.S.App.D.C. at 398, 481 F.2d at 1082, the court found the program "has life," which, for purposes of NEPA, was sufficient to make a case or controversy.

> The instant case is ripe under these principles since the issue tendered for review is whether an impact statement on the AEC's LMFBR program is *presently* required under NEPA. * * * In the context of a long-range program such as is involved here, judicial review of compliance with NEPA is necessary at stages at which significant resources are being committed, lest the statute's basic purpose be thwarted.

156 U.S.App.D.C. at 403 n. 29, 481 F.2d at 1086 n. 29 (emphasis in original). As we shall make clear below, we think appellees' plans to control development of the Northern Great Plains have sufficient life to state a case or controversy.

Second, appellants allege that appellees' conduct in the Northern Great Plains constitutes a "major federal action," so that a NEPA statement is required. Actions, both past and imminent, have been alleged. While the courts will typically not rule in NEPA cases until after the agency decision to act, the essence of appellants' complaint is that appellees have already decided to act, although they have not admitted as much. Again, *SIPI* is directly in point. *SIPI* recognized, necessarily, the propriety of judicial intervention in determining the dictates of NEPA. While it spoke expressly only of judicial determination that the time for an EIS was ripe, 156 U.S.App.D.C. at 410, 481 F.2d at 1094, the principle and *SIPI*'s holding apply as well for judicial determination that the Government is engaged in "major federal action." Therefore, while in the first instance it is for the Government to decide whether an impact statement is necessary, where the Government improperly fails to treat the cumulative effect of individual actions as a "major federal action" it is appropriate for the courts to intervene, and do so sufficiently early that the purposes of NEPA are not thwarted.

We think that in a case like this, where appellants allege the individual federal steps taken in the Northern Great Plains, considered together, constitute a major federal action, a case or controversy is stated when the challenged individual actions are alleged, along with a reasonable basis for treating them cumulatively under NEPA, and there is a claim that "significant resources are being committed." 156 U.S.App.D.C. at 403 n. 29, 481 F.2d at 1086 n. 29. We think appellants have met this test. As in *SIPI*, the issue they raise is "whether an impact statement on [development of the Northern Great Plains] is *presently* required under NEPA." *Id.* (emphasis in original). On this issue, there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). *See also* Abbott Laboratories v. Gardner, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Eccles v. Peoples Bank, 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784 (1948); Ashwander v. TVA, 297 U.S. 288, 324, 56 S.Ct. 466, 80 L.Ed. 688 (1936). Thus we think a justiciable case or controversy has been stated and the District Court erred in holding otherwise. Of course, the fact that appellants do not fully prevail on the merits does not operate, retroactively, to expunge the controversy.

The second preliminary issue concerns appellants' standing to sue. Appellants alleged, Complaint ¶¶ 3–9, App. 3–5, and the District Court found, that

> [m]any members of plaintiff organizations live, work, engage in recreational activities, own land and hold surface rights on or immediately adjacent to the sites of coal mining and related activities in the four-state area * * *.

Fdg. 1, App. 233. Appellants further alleged that development of coal resources in the Northern Great Plains would cause direct harm to various of their members' economic, environmental, recreational, and aesthetic interests in the Region. Complaint, ¶¶ 10, 37, App. 5, 20–21. Such "injury in fact," if proved, plainly meets the broad test of standing outlined in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and applied in United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). *See also SIPI, supra* note 15, 156 U.S.App.D.C. at 403 n.29, 481 F.2d at 1086 n.29. In this case, however, standing can be deemed to have been proved only by appellant Northern Plains Resource Council (NPRC). The issue of standing as to all appellants was raised by the denials of the federal appellees, and of various intervenor appellees as well. Answer of feder-

## III

NEPA's applicability to the cumulative effect of individual actions was an early issue in the impact statement cases, and has continued to require definition to date.[21] An environmental impact statement is only required, of course, for "proposals for legislation and other *major Federal actions* significantly affecting the quality of the human environment * * *." Section 102(2)(C), 42 U.S.C. § 4332(2)(C) (emphasis added). While the meaning of "legislation" is fairly clear, the precise content of "major Federal actions" is often open to question, and was, apparently purposely, enacted by Congress without definition. When an individual project—a dam, a highway, a parking plan—crossed the boundary line from minor to major action was the first issue presented to the courts, and it was one capable of fairly ready resolution. *See, e. g.*, Scherr v. Volpe, 7 Cir., 466 F.2d 1027 (1972); Citizens Organized to Defend Environment, Inc. v. Volpe, S.D.Ohio, 353 F.Supp. 520 (1972); Monroe County Conservation Council, Inc. v. Volpe, 2 Cir., 472 F.2d 693 (1972); Crary v. Morton, D.D.C. (Civ. No. 75–1023, order issued Feb. 11, 1975).

More difficult, but also readily resolved, was the question whether the cumulative effect of various federal actions, all individually minor, could together constitute a "major federal action." The courts, aided by the Guidelines of the Council on Environmental Quality (CEQ), the body established by NEPA to review agency compliance with Sections 101 and 102 of the Act, 42

al appellees, ¶¶ 3–10, 37, App. 100, 109. *See, e. g.*, answer of intervenor Nebraska Public Power District, ¶¶ 3–4, App. 138–139. Nonetheless, except for the NPRC, no appellant introduced any evidence to prove its standing, and the District Court made no express finding that any appellant had standing, presumably because there was no challenge to appellants' standing in appellees' motion for summary judgment. Of course, standing to sue is an essential element of a cause of action and must be "demonstrated" as well as "alleged," particularly where controverted. *SIPI, supra* note 15, 156 U.S.App.D.C. at 403 n. 29, 481 F.2d at 1086 n. 29. *See also* United States v. SCRAP, *supra*, 412 U.S. at 689–690, 93 S.Ct. 2405. On remand to the District Court appellants may introduce evidence of their standing to allow the District Court the opportunity to rule on the issue if appellees continue to deny it. *Cf.* Sierra Club v. Morton, *supra*, 405 U.S. at 735 n. 8, 92 S.Ct. 1361.

NPRC introduced into evidence two affidavits from its Vice Chairman, Christopher Muller. The affidavits relate directly to the proposed Westmoreland Resources coal mine on Crow-ceded land. *See* note 15 *supra*. Muller identifies those members of his organization who reside in the vicinity of the proposed mine and the adverse environmental, aesthetic, and economic effects on those members of continued construction of the mine. Affidavits of Christopher Muller, Nov. 7, 1973 and Dec. 21, 1973. While appellees attempted to controvert the Muller affidavits with an affidavit from W. J. Connelly of Westmoreland Resources asserting that the adverse effects on appellants were minimal, Affidavit of W. J. Connelly, Jan. 11, 1974, it is clear that minimal "injury in fact" is sufficient for standing. United States v. SCRAP, *supra*, 412 U.S. at 688–690, 93 S.Ct. 2405. *See also* New Jersey Chapter, Inc., A.P.T.A., Inc. v. Prudential Life Ins. Co., 164 U.S.App.D.C. 40, 44, 502 F.2d 500, 504 (1974) ("Standing need not be founded on a rock; a pebble or even a cobweb may do."). That there will be at least minimal injury is uncontroverted. Of course, the fact that an impact statement has been approved for the Westmoreland mine, *see* note 15 *supra*, does not affect appellants' injury, nor does it deprive them of standing to seek a comprehensive statement for the entire Region, since the injury caused them by development of the Westmoreland mine is part of the injury regional development would cause. Since appellant NPRC has demonstrated "injury in fact," and since it does not appear to be contested that the injury is within the zone of interests intended to be protected by NEPA, *see* Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), we hold that NPRC had standing to bring the suit below, and to bring this appeal.

21. A related problem, essentially the converse of this one, is determining when a major action should be segmented into smaller actions so as to allow filing an impact statement for the smaller actions. *See, e. g.* Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 5 Cir., 446 F.2d 1013 (1971); Natural Resources Defense Council v. Morton, D.D.C., 388 F.Supp. 829 (1974); Committee to Stop Route 7 v. Volpe, *supra* note 20. *Cf.* Indian Lookout Alliance v. Volpe, 8 Cir., 484 F.2d 11 (1973).

U.S.C. § 4344(3), have consistently held that the purposes of NEPA would be violated if an impact statement were not required in such cases. The Guidelines make clear that the statutory term "major Federal actions" must be assessed "with a view to the overall, cumulative impact of the action proposed, related Federal action and projects in the area, and further actions contemplated." 40 C.F.R. § 1500.6(a) (1974). *Cf.* 36 Fed. Reg. 7724 (1971) (the original guidelines).[22] The Guidelines further explain how minor federal actions can be "cumulatively considerable."

> This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents a decision in principle about future courses of action, or when several Government agencies individually make decisions about partial aspects of a major action.

40 C.F.R. § 1500.6(a) (1974). This interpretation of the statutory term is eminently reasonable, both because NEPA plainly mandates comprehensive consideration of the effects of all federal actions, 42 U.S.C. § 4332(2)(A), which consideration would be defeated if impact statements were required only for *individual* projects of "major" size, and because any other interpretation would provide an escape hatch, through agency subdivision of "major" projects, from the impact statement requirement.

> Almost every project can be divided into smaller parts, some of which might not have any appreciable effect on the environment. The court would be forced to take each project apart piece by piece * * *.

People of Enewetak v. Laird, D.Hawaii, 353 F.Supp. 811, 821 (1973). Thus the

courts have had no difficulty in requiring impact statements for "major Federal actions" that were no more than the cumulative effect of related minor federal actions. *See, e. g.,* Natural Resources Defense Council, Inc. v. Grant, E.D.N.C., 341 F.Supp. 356, 367 (1972); People of Enewetak v. Laird, *supra*; Minnesota PIRG v. Butz, D.Minn., 358 F.Supp. 584, 622 (1973); SCRAP v. United States, D.D.C., 346 F.Supp. 189, 200 (1972) (three-judge court), reversed on other grounds, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ("the necessity of preparing an impact statement cannot be avoided or postponed * * * by breaking [the action] into minute component parts"). *Cf.* Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 5 Cir., 446 F.2d 1013, 1022–1023, cert. denied, 403 U.S. 932, 91 S.Ct. 2257, 29 L.Ed.2d 711 (1971).

The next problem to reach the courts involving cumulative impact of related activities was also the logical next step. If the cumulative effect of individually minor federal actions could constitute a major federal action, could the cumulative impact of admittedly major federal actions do so as well? Even if individual impact statements were being prepared for the individual actions, would a comprehensive statement for the cumulative action also be necessary? The answer was provided by this court's *SIPI* decision. Finding no distinguishing principle separating assessment of the cumulative impact of individually minor actions from the cumulative impact of individually major actions, we held that NEPA's impact statement requirement is not limited to individual projects. Rather, in *SIPI* we demanded that the Atomic Energy Commission prepare a comprehensive impact statement for its Liquid Metal Fast Breeder Reactor (LMFBR) program, even though an individual state-

---

**22.** Although the CEQ Guidelines lack the force of law, we should "not lightly suggest that the Council, entrusted with the responsibility of developing and recommending national policies 'to foster and promote the improvement of the environmental quality,' * * * has misconstrued NEPA." Greene County Planning Board v. FPC, 2 Cir., 455 F.2d 412, 421, cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). *See* note 24 *infra*.

ment had been prepared for the one existing fast breeder demonstration plant and even though the Commission planned to issue an individual statement for each future plant and test facility within the program.

The Commission takes an unnecessarily crabbed approach to NEPA in assuming that the impact statement process was designed only for particular facilities rather than for analysis of the overall effects of broad agency programs. Indeed, quite the contrary is true.

156 U.S.App.D.C. at 402–403, 481 F.2d at 1086–1087. *See also* Natural Resources Defense Council v. Morton, *supra* (emphasizing the need for comprehensive environmental planning). *SIPI*'s approach is firmly echoed by a contemporaneous First Circuit decision. In Jones v. Lynn, 1 Cir., 477 F.2d 885 (1973), the court held that preparation of impact statements on individual buildings within an urban renewal project would be both impractical and, unless the individual statement evaluated the "cumulatively significant impact" of the entire federal role in the project, in violation of NEPA. Instead a comprehensive statement was required.

[I]t would not seem sensible to adopt the piecemeal approach which HUD seeks to adopt, whereby it will prepare a modified impact statement separately for each proposed construction as a mortgage insurance application is filed, an approach akin to equating an appraisal of each tree to one of the forest.

*Id.* at 891. *See also* Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 2 Cir., 508 F.2d 927 (1974).

■ We think *SIPI*'s holding that statements are necessary for "broad agency programs" in addition to "particular facilities" was firmly based, and we

reaffirm it here. We do not understand appellees to dispute *SIPI*'s validity. In fact, we note that, in compliance with the CEQ Guidelines and with *SIPI*, Interior has itself decided a national coal programmatic statement is necessary to assess the broad impact of its national coal development policy.[23] Likewise, when confronted with applications for approval of four mining plans and a railroad right-of-way in one subregion of the Northern Great Plains, the Eastern Powder River coal basin, Interior properly decided to assess the cumulative environmental impact of the individual projects through a regional impact statement. *See* note 15 *supra*.

In *SIPI* the AEC admitted it was engaged in the LMFBR program. We must now decide whether to extend *SIPI* to require comprehensive impact statements in situations where the responsible agencies deny they are engaged in a broad program. Appellants would have us hold that an impact statement is necessary in this case "precisely because the federal agencies have not prepared any plan for coal development in the Northern Great Plains." Appellants' brief at 47. They rely primarily on the following provision from the CEQ Guidelines:

Agencies should give careful attention to identifying and defining the purpose and scope of the action which would most appropriately serve as the subject of the statement. In many cases, broad program statements will be required in order to assess the environmental effects of a number of individual actions on a given geographical area (e. g., *coal leases*), or environmental impacts that are generic or common to a series of agency actions (e. g., maintenance or waste handling practices), or the over-all impact of a large-scale program or chain of contemplated projects (e. g., major

**23.** It is not suggested by appellees that this national programmatic statement is sufficiently detailed to substitute for a regional statement covering the Northern Great Plains, and our examination of the draft statement makes it clear that it is not. *Cf.* Natural Resources Defense Council v. Morton, *supra* note 21. For the limitations of the national statement, *see* Draft Environmental Impact Statement, Proposed Federal Coal Leasing Program at I–6, I–7. *Cf.* note 15 *supra*.

lengths of highway as opposed to small segments). Subsequent statements on major individual actions will be necessary where such actions have significant· environmental impacts not adequately evaluated in the program statement.

40 C.F.R. § 1500.6(d)(1) (1974) (emphasis added). Appellants read these guidelines to require a comprehensive impact statement whenever a group of individual federal projects are related geographically, environmentally, or programmatically. After extensive anaylsis of federal activities in the Northern Great Plains, appellants conclude "the projects and federal actions relating to coal development in the Northern Great Plains region are related in all three of these ways." Appellants' brief at 33. Appellees argue that a statement is required only when the Government has itself designated the activities at issue a "program." They claim the CEQ Guidelines support this approach, arguing that reference to the need for "broad *program* statements" means the Guidelines only define when broad statements are needed in pre-existing programs. Intervenor appellees' brief at 31 n. 1.

■ We reject appellees' constricted reading of the Guidelines. Whether a comprehensive impact statement is required cannot turn simply on whether the agency has denominated a comprehensive series of actions a "program." This argument is analogous to that in the early NEPA cases when agencies denied that related minor actions constituted, *in toto*, a major action. We did not hesitate at that time in holding that major actions were involved despite the agency denials; where appropriate, we will not hesitate now. The fact of an agency denial does not end the controversy, but rather points to why the controversy exists. Surely the result in *SIPI* would have been no different had the AEC simply denied that a comprehensive program was involved, all the other underlying facts being the same.

At a minimum, the courts must reserve the right to analyze federal actions to determine if, in fact, a comprehensive program, however labeled, is under way or proposed. *See* SCRAP v. United States, *supra*, 346 F.Supp. at 200.

This conclusion is firmly supported by the recent Second Circuit decision in Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, *supra*. In *Conservation Society* the court upheld the determination of the District Court that the Department of Transportation could not proceed with improvement of a 20-mile segment of U.S. Route 7 until a comprehensive impact statement was prepared for the entire 280-mile length of Route 7. The District Court so held, although it acknowledged that there was no present plan for overall development of the road; it found, however, that ultimate conversion of Route 7 into a superhighway was a goal held by the federal defendants and that it was "possible of accomplishment with legislative and federal approval over a long-range period of time * * *." D.Vt., 362 F.Supp. 627, 636 (1972). Since ultimate conversion was the expectation of the federal defendants, and since completion of the 20-mile segment at issue would constitute an irreversible and irretrievable commitment of resources that would generate more traffic and thereby create synergistic pressure for further construction, the District Court ruled that major federal action was proposed, within the meaning of Section 102(2)(C), and that the time was ripe for a comprehensive impact statement. The Second Circuit agreed.

■ While we thus feel firmly grounded in inquiring into the actual nature of the Government's actions, appellants would have us go further than this. Essentially, they would have the courts require filing of a comprehensive impact statement if a comprehensive program *should be* under way. Admittedly, the CEQ Guidelines, which are entitled to great respect,[24] do seem to sweep that

---

24. "When faced with a problem of statutory construction, this Court shows great deference

to the interpretation given the statute by the officers or agency charged with its administra-

broadly. Moreover, there are dicta in the cases suggesting that the duty to plan comprehensively can be imposed on the Government apart from the duty to file an impact statement for comprehensive plans. For instance, Natural Resources Defense Council v. Morton, *supra,* suggests:

> What NEPA infused into the decision-making process in 1969 was a directive as to environmental impact statements that was meant to implement the Congressional objectives of Government coordination, *a comprehensive approach to environmental management,* and a determination to face problems of pollution "while they are still of manageable proportions and while alternative solutions are still available" *rather than persist in environmental decision-making wherein "policy is established by default and inaction" and environmental decisions "continue to be made in small but steady increments" that perpetuate the mistakes of the past without being dealt with until "they reach crisis proportions."* S.Rep.No.91–296, 91st Cong., 1st Sess. (1969) p. 5.

148 U.S.App.D.C. at 14, 458 F.2d at 836 (emphasis added). Viewed broadly, this language plainly contemplates *imposing a requirement of comprehensive plan*-ning on the Government when it refuses to do so itself. Indeed, NEPA does declare it federal policy "to use all practicable means * * * *to improve and coordinate Federal plans,* functions, programs and resources" in order to protect the environment. Section 101(a), 42 U.S.C. § 4331(a) (emphasis added). NEPA's substantive provisions may be enforced in court as well as its procedural requisites.[25] *See* Calvert Cliffs' Coordinating Committee v. AEC, *supra,* 146 U.S.App.D.C. at 38, 449 F.2d at 1114. Agency violation of this substantive duty by a failure to improve its plans or coordinate its actions might justify a judicial directive to coordinate various major federal actions into one comprehensive major federal action, followed by a directive ordering issuance of a comprehensive impact statement for that newly-comprised action.

While we approve, in theory, the legal basis for appellants' argument, we note the practical difficulties in its broad application. An infinite number of geographic, environmental, or programmatic interrelationships might be found among the various individual federal projects under way throughout the country. Surely, however, an infinite number of comprehensive plans, and comprehensive impact statements, are not required.

tion." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *See also* Rosado v. Wyman, 397 U.S. 397, 415, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). While CEQ is not strictly charged with administration of NEPA, it is charged with the duty of reviewing and appraising agency compliance with the statute, and so is entitled to deference. 42 U.S.C. § 4344(3). This deference is heightened when, as here, the administrative interpretation is adopted soon after passage of the legislation. Power Reactor Development Co. v. International Union of Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); United States v. Zucca, 351 U.S. 91, 96, 76 S.Ct. 671, 100 L.Ed. 964 (1956); United States v. American Trucking Assns, 310 U.S. 534, 549 (1940). Accordingly, the courts have consistently deferred to CEQ guidelines. *See SIPI, supra* note 15, 156 U.S.App.D.C. at 402–404, 481 F.2d at 1086–1088; Greene County Planning Board v. FPC, *supra* note 22, 455 F.2d at 421; Environmental

Defense Fund v. TVA, 6 Cir., 468 F.2d 1164, 1178 (1972). *See* note 22 *supra.*

**25.** Six circuits have found that agency action in violation of the substantive provisions of NEPA may be enjoined. However, the action must be found to be arbitrary or capricious. *See* Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D.C. 33, 39, 449 F.2d 1109, 1115 (1971); Environmental Defense Fund v. Corps of Engineers, 8 Cir., 470 F.2d 289, 300 (1972); Sierra Club v. Froehlke, 7 Cir., 486 F.2d 946, 953 (1973); Conservation Council of North Carolina v. Froehlke, 4 Cir., 473 F.2d 664, 665 (1973); Silva v. Lynn, 1 Cir., 482 F.2d 1282, 1283 (1973); Jicarilla Apache Tribe of Indians v. Morton, 9 Cir., 471 F.2d 1275, 1281 (1973). *Contra,* National Helium Corp. v. Morton, 10 Cir., 455 F.2d 650 (1971). Thus an agency could not be found to have failed to plan comprehensively in violation of NEPA unless that failure was so gross as to be arbitrary and capricious.

Moreover, the Guidelines are intended to guide agency planners in the need for impact statements. It is, of course, the agencies that are supposed to organize the various federal projects throughout the country, not litigants who come into court seeking, possibly in opposition to one another, to force the agencies into action according· to their lights; one might seek, for instance, a coal impact statement for the Northern Great Plains, another for the four-state region, and another for the state of Wyoming alone. Use of NEPA to force a comprehensive plan on an unwilling agency as a means to force that agency to undertake a comprehensive impact statement might intrude unduly on agency discretion, while overly involving the courts in the day-to-day business of running the Government.

This is not to say appellants' claim is without merit. We have noted above the persuasiveness of their legal arguments. Since the courts would only find an agency to be in violation of the substantive provisions of NEPA if its failure to plan comprehensively was arbitrary or capricious, the dangers suggested above would be minimized.[26] And there may be instances where judicial intervention is justified. Surely we are not willing to hold that the less comprehensive planning an agency chooses to do, the less NEPA requires it to do. Such a *reductio ad absurdum* would make a mockery of the Act. However, we need not decide appellants' claim here. We think the facts in the record and as found by the District Court establish that regional development of the Northern Great Plains is contemplated by the federal appellees. The proposal for such development would constitute a proposal for major federal action within the meaning of Section 102(2)(C) and demand issuance of a comprehensive regional impact statement.

It is beyond question that federal action within the meaning of the statute includes not only action undertaken by the agency itself, but also any action

permitted or approved by the agency. ·*SIPI, supra,* 156 U.S.App.D.C. at 404, 481 F.2d at 1088. Approving leases to private parties and granting licenses or permits to private parties are familiar—and well-established—examples of major federal actions. *See, e. g.,* Davis v. Morton, 10 Cir., 469 F.2d 593 (1972); Greene County Planning Board v. FPC, *supra;* Scenic Hudson Preservation Conference v. FPC, 2 Cir., 453 F.2d 463 (1971); Calvert Cliffs' Coordinating Committee v. AEC, *supra.* It is clear, and we do not understand the federal appellees to contest it, that most, if not all, of the ongoing and pending actions in the Northern Great Plains are subject to federal approval and are thereby federal actions. That these actions are major and that they significantly affect the human environment is also not contested. Certainly actions in the Region subject to Section 102(2)(C) include the approving of mining plans, the granting of rights-of-way across federal lands, and the granting of water rights from federal reservoirs. Thus the relevant question is not whether major federal actions are being taken in the Northern Great Plains, nor is it whether impact statements are necessary for those actions. The question is whether the federal appellees have treated those actions regionally in such a way that they comprise, cumulatively, a major federal action.

We believe the evidence mandates an affirmative answer.

The evidence is overwhelming that the federal appellees have for years been endeavoring to develop a plan for regional development of the coal resources in the Northern Great Plains. The North Central Power Study, the Montana-Wyoming Aqueducts Study, and the Northern Great Plains Resources Program were all undertaken for this purpose. The purpose of the aborted North Central Power Study was "to promote the coordinated development of electric power supply in the North Central United States." *Id.,* Report of Phase I, Volume I, at 2 (1971). The "key resource" for

26. See note 25 *supra.*

development of that power supply was coal. *Id.* The stalled Aqueduct Appraisal Report, after recommending construction of large-capacity aqueducts to serve the industrial needs resulting from development of the coal fields, concluded:

> The apparent impact of the development will require that full-scale comprehensive studies be initiated in the near future, in cooperation with the states and others, to assure an orderly and manageable growth pattern to minimize adverse environmental effects and impacts.

*Id.* at 31 (1972). Now the NGPRP is under way, an interagency, federal-state task force whose primary objective is "to provide information and a comprehensive analysis that can be used to place the potential impacts of coal development into perspective and thereby assist the people of the Northern Great Plains and the Nation in the management of the natural and human resources of this region." NGPRP Draft Interim Report at I–4 (1974). Secretary Morton tells us that all three of these programs were "attempts to control development by individual companies." Affidavit of Secretary Morton, App. 190. The District Court accepted this assertion as fact. Fdg. 14, App. 237.

The need for comprehensive regional development of the Northern Great Plains was recognized by responsible officials in the various agencies that subsequently became involved in the NGPRP. On May 2, 1972 Secretary of Agriculture Butz wrote to the Administrator of the Environmental Protection Agency with reference to coal development in the Northern Great Plains: "We agree that a comprehensive, systematic, and interdisciplinary study of all aspects of the development and use of our coal reserve is needed." App. 75. On July 6, 1972 he wrote to Senator Mansfield, again with reference to the Northern Great Plains: "[T]here is considerable urgency and need for a coordinated mineral development strategy." App. 74. Likewise, on November 2, 1972 the Chief of the Forest Service wrote to Senator Mansfield

concerning coal leasing in the national forests in the Region. He reported that "a prerequisite to further leasing should be a plan for coordinated development consistent with adequate environmental protection and the public interest." App. 78, 119 Cong.Rec. 1504 (1973). That same year Assistant Secretary of the Interior for Public Land Management Harrison Loesch told a congressional committee that "[w]e are presently investigating the necessity, and we think it is a necessity, of rather comprehensive study and planning effort in the large coal basins of Montana and Wyoming." Federal Leasing and Disposal Policies, Hearing Before the Senate Committee on Interior and Insular Affairs, 92d Cong., 2d Sess., 85 (1972).

The NGPRP is the federal response to these expressed concerns. It is the Government's attempt to formulate a regional program that will enable it to control development of the Northern Great Plains. This is demonstrated not only by the stated goals of the program itself, *see supra,* 169 U.S.App.D.C. at ——, 514 F.2d at 875, but by the suspension of activity in the Region pending its completion, by the comments of responsible officials, and by the findings of the District Court. In setting up the NGPRP in 1972, Secretary Morton described it as "an excellent opportunity for this Department to demonstrate how a responsible Federal agency can manage resources development with proper regard for environmental protection." App. 200; *see supra,* 169 U.S.App.D.C. at ——, 514 F.2d at 863. In responding to questions about development of the Region posed by a congressional committee, Interior provided this statement:

> An assurance of orderly and timely development would require an analysis and assessment of such items as regional coal demand and the relationship to existing leases. The Department is initiating a State, local and Federal program to develop a regional development plan or framework for the Montana, Wyoming, North Dakota and South Dakota area associated with

the Powder River and Fort Union coal formations. The objective is the wise development of the region accomplished in full realization of social, economic and ecological consequences of alternative possibilities.

*Federal Leasing and Disposal Policies, Hearing Before the Senate Committee on Interior and Insular Affairs,* 92d Cong., 2d Sess., 189 (1972). The program mentioned obviously was the NGPRP. Lastly, the District Court found that the interim report of the NGPRP

will provide an informational foundation for decision-making and planning. This information will be utilized in decision-making for all coal related actions in the Northern Great Plains areas and will form a useful reference source for preparing environmental analyses and statements on proposed

actions or groups of actions in the Northern Great Plains area.[27]

Fdg. 27, App. 242.

▬▬▬ However, while the NGPRP does attempt to provide a framework for decision-making to allow the federal government to control development of the Northern Great Plains, it plainly recognizes the need, which it does not fill, for cumulative study of the environmental impact of that development.[28] The draft interim report asks, "Is the impact of two mines or powerplants in the same area twice as great as the impact of one, or is it larger?" It warns, "[T]he impacts of coal development in the Northern Great Plains may be greater than the projection and analytic techniques used have been able to delineate." NGPRP Draft Interim Report at V–2. The NGPRP does not purport to provide

27. The court also found:

The purpose of the Department of Interior policy with respect to resource development in the Northern Great Plains Areas is to insure that development does not proceed based solely on single purpose studies incapable of developing comprehensive information or by piecemeal actions which restrict future options. To fulfill that purpose the granting or approval of leases, special use permits and all types of rights-of-way across public lands, the delivery and sale of water and approval of mining plans relating to coal development in the Northern Great Plains areas will be held in abeyance pending the availability and analysis of the interim report from the NGPRP study or submitted to the Under Secretary of Interior for review and concurrence prior to execution.

Fdg. 25, App. 241.

28. The Environmental Protection Agency has also recognized the need for cumulative environmental consideration of the Region. Exercising his statutory and regulatory duty to review and comment on major agency actions to which § 102(2)(C) applies, *see* 42 U.S.C. § 1857h–7(a), 40 C.F.R. § 1500.9(a) (1974), the EPA Administrator, in identical letters to the Secretaries of the Interior and Agriculture, stated with regard to development of the Northern Great Plains:

Environmental impact statements prepared on a project-by-project basis in accordance with the National Environmental Policy Act are not adequate to evaluate the overall re-

gional impact. What is needed is a comprehensive, systematic and interdisciplinary study of coal development in this region, similar to the Southwest Energy Study and the oil shale development program, which satisfies the letter and spirit of the National Environmental Policy Act.

App. 82.

The dissent suggests the various projects contemplated in the Northern Great Plains are essentially independent of one another, so that a commitment to one project entails no consequences for another. Thus there is no need for comprehensive environmental planning, and *SIPI* and Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 2 Cir., 508 F.2d 927 (1974), are inapposite. Dissent *infra* 169 U.S.App.D.C. at — – —, 514 F.2d at 887–889. We disagree. To cite two examples beyond those suggested above, the availability of water and manpower in the Region is limited. Coal mining is crucially dependent upon both. Thus development of one mine is considerably more than an irretrievable commitment to that mine. In the case of water supply, it forecloses the possibility of another, environmentally preferable, mine. In the case of manpower, it creates pressure for a population influx which, while minor for one mine, may be cumulatively considerable. As *SIPI* and *Conservation Society* tell us, it is these sorts of environmental effects that can be best addressed in a regional, comprehensive manner. *See also* note 31 infra.

answers to these problems. We believe, however, that NEPA requires those answers be found. It is our view that when the federal government, through exercise of its power to approve leases, mining plans, rights-of-way, and water option contracts, attempts to "control development" of a definite region, it is engaged in a regional program constituting major federal action within the meaning of NEPA, whether it labels its attempts a "plan," a "program," or nothing at all. Thus, supported by the *Conservation Society* precedent and based on the evidence presented to the District Court and the facts as found by the District Court, we hold that comprehensive major federal action is contemplated in the Northern Great Plains. The District Court's contrary conclusion of law was in error.[29]

**29.** The cases relied upon by appellees and the District Court to show that no impact statement is required for a regional plan such as the NGPRP are all inapposite. Every cited case involved the propriety of an injunction against an individual project pending completion of a regional EIS or other study. None of the cases involved a direct challenge to the need for a regional EIS. *See* Sierra Club v. Callaway, 5 Cir., 499 F.2d 982 (1974); Jicarilla Apache Tribe of Indians v. Morton, *supra* note 25; Indian Lookout Alliance v. Volpe, *supra* note 21; Sierra Club v. Stamm, 10 Cir., 507 F.2d 788 (1974); Trout Unlimited v. Morton, 9 Cir., 509 F.2d 1276 (1974); Environmental Defense Fund v. Armstrong, N.D.Cal., 356 F.Supp. 131, aff'd, 9 Cir., 487 F.2d 814 (1973); Movement Against Destruction v. Volpe, D.Md., 361 F.Supp. 1360 (1973); Sierra Club v. Froehlke, S.D.Tex., 359 F.Supp. 1289, 1324–1325 (1973); Conservation Council of North Carolina v. Froehlke, M.D.N.C., 340 F.Supp. 222, 227 (1972), remanded, 4 Cir., 473 F.2d 664 (1973).

Of course whether an injunction will issue in such a case depends on many factors in addition to whether a regional EIS is required, including the state of construction of the challenged project and the comprehensiveness of the impact statement for that project. *See* Sierra Club v. Callaway, *supra,* 499 F.2d at 987. Thus whether a regional EIS is required was not determinative for resolution of the cited cases. Moreover, many of the cases did not even raise the issue of a regional impact statement, but merely sought delay of an individual project until completion of a regional *study* that might be of some assistance in preparing the individual statement. This was the situation in Jicarilla Apache Tribe of Indians v. Morton, *supra* note 25, relied on most heavily by appellees. There plaintiffs sought to delay four individual coal-fired electric generating projects in four southwestern states pending issuance of the Southwest Energy Study. The court sensibly rejected the claim:

If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated.

471 F.2d at 1280. Even appellees concede that there was no claim made in *Jicarilla* that a regional impact statement was necessary. Intervenor appellees' brief at 28.

Likewise, in Environmental Defense Fund v. Armstrong, *supra,* also heavily relied upon by appellees, the need for a regional statement was not at issue. Plaintiffs there sought a "comprehensive study," not an EIS, of the Central Valley Project before approval of the New Melones dam impact statement. The court refused to wait for the study, noting that "no comprehensive study has been commenced, let alone completed." 356 F.Supp. at 139. This is in sharp contrast to this case where a comprehensive study is under way, and the need for a comprehensive statement is at issue.

In Sierra Club v. Callaway, *supra,* the Fifth Circuit refused to delay the Wallisville Project pending a comprehensive EIS for the entire Trinity Basin Project. The holding was based on its findings that Congress intended the two projects to be treated separately, that the Wallisville Project was not, in fact, a component of the Trinity Basin Project, that the Wallisville Project was 72% complete while the Trinity Basin Project might not be completed for 40 to 50 years, and that the Wallisville Project was well under way before the effective date of NEPA. Thus Sierra Club v. Callaway is fully distinguishable; there was no comprehensive plan at all.

This crucial dependence upon the facts of the case was stressed in Sierra Club v. Stamm, *supra,* also heavily relied upon by appellees. Whether the Strawberry Aqueduct and Collection System was itself a major federal action or merely a component of the larger Bonneville Unit, or the entire Central Utah Project, was a question of fact as well as law, and turned crucially on "the 'facts' as * * * found by the trial court * * *." 507 F.2d at 791. The Tenth Circuit agreed

with the trial court that the Strawberry system in and of itself constitutes a "major Federal action" and that it is not a mere increment of either the Bonneville Unit or the Central Utah Project requiring a final impact statement for something more than

## IV

Our conclusion that major federal action is contemplated in the Northern Great Plains does not mean, *ipso facto*, that a comprehensive regional impact statement is required. A statement must precede the "recommendation or report on *proposals* for * * * major Federal actions." Section 102(2)(C), 42 U.S.C. § 4332(2)(C) (emphasis added). This raises the question of timing that was so critical in *SIPI*. We think it patent that the term "proposals" does not encompass every suggestion, however unlikely to reach fruition, made by a federal officer. Certainly federal officers are entitled to dream out loud without filing an impact statement. Thus we think it proper to inquire, before an EIS is required, whether the proposal for action has progressed beyond the "dream" stage into some tangible form so that the time for an impact statement is ripe. *SIPI, supra*, 156 U.S.App.D.C. at 409–410, 481 F.2d at 1093–1094. We should note, however, that the "ripeness" necessary before a statement is required is slight. Preparation of a statement must precede, or at least accompany, preparation of the recommendation or report on the proposal, so that the agency may have the opportunity to assess the environmental impact of its plans before committing itself, even tentatively, to action. An impact statement is designed to aid agency decision-making, not provide an *ex post facto* justification for it. We fully adhere to our statement in Calvert Cliffs' Coordinating Committee v. AEC, *supra*, that

> [c]ompliance [with NEPA demands] that environmental issues be considered at every important stage in the decision making process concerning a particular action—at every stage where an overall balancing of environmental and nonenvironmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs.[30]

146 U.S.App.D.C. at 42, 449 F.2d at 1118. But, as *SIPI* tells us,

> [W]e are pulled in two directions. Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process.

156 U.S.App.D.C. at 410, 481 F.2d at 1094.

---

the Strawberry system before work may be commenced on the Currant Creek Dam. *Id.* at 792–793. Again we note this case was in the context of a challenge to the individual project and did not involve the question whether a comprehensive EIS was necessary on its own merits. Moreover, the Tenth Circuit found the facts sufficient to treat the Strawberry System apart from the overall project. To the extent, however, that the Tenth Circuit proceeded on the assumption that only one "major Federal action" could be found, either the entire Bonneville Unit, the entire Central Utah Project, or the Strawberry System, we disagree. It is clear to us that a *major federal action* may require an impact statement for itself and still be a part of a larger major federal action that also requires a statement. That was the holding of *SIPI*, and we adhere to it. To the extent Sierra Club v. Stamm is contrary, we decline to follow it.

The last important case cited to us by appellees is Trout Unlimited v. Morton, *supra*. There the Ninth Circuit held that an EIS prepared for the First Phase of the Lower Teton Division of the Teton Basin Project was adequate despite the fact that it did not attempt to analyze the environmental impacts of the Second Phase. The court distinguished the case before it from cases requiring comprehensive impact statements by noting that the First Phase was "substantially independent" of the Second, that approval of the Second was not a foregone conclusion since approval of the Secretary of the Interior and the Congress had yet to be obtained, and that the First Phase would be fully functional even if the Second were never built. We think those distinguishing factors fully distinguish Trout Unlimited from the instant case where the thrust of appellants' complaint is that widespread development of the Northern Great Plains is virtually certain to occur, and that the effects of the individual projects can only be meaningfully assessed in cumulative terms.

**30.** Compliance with the substantive demands of § 102(2)(A) and (D) is required, of course, even before an impact statement is necessary under § 102(2)(C).

■ The problem *SIPI* notes with regard to research and development programs applies with like force to defining any "proposal" within the meaning of. Section 102(2)(C). *SIPI* identified four balancing factors that must be analyzed and weighed to determine if the time is ripe for an impact statement. *Id. Cf.* 40 C.F.R. § 1500.6(d)(2). With minor modifications to make the factors applicable to all federal actions and not just the research and development program at issue in *SIPI*, we adopt those factors here. Thus the agency, or the reviewing court, should inquire as follows: How likely is the program to come to fruition, and how soon will that occur? To what extent is meaningful information presently available on the effects of implementation of the program, and of alternatives and their effects? To what extent are irretrievable commitments being made and options precluded as refinement of the proposal progresses? How severe will be the environmental effects if the program is implemented?

■ As we pointed out in *SIPI*, application of this test is in the first instance a task for the agency, since answering the questions, and balancing the answers, clearly requires agency expertise. *See id. See also* Citizens Assn of Georgetown, Inc. v. Zoning Comm'n of D. C., 155 U.S.App.D.C. 233, 239, 477 F.2d 402, 408 (1973); Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 145, 479 F.2d 842, 866 (1973) (*en banc*). While judicial scrutiny of an agency decision that the time is not yet ripe for a statement is, of course, appropriate, *SIPI, supra*, 156 U.S.App.D.C. at 410, 481 F.2d at

1094, our analysis of the balancing factors is inconclusive at this time and, because we are told that appellees are about to resolve certain dispositive uncertainties, we remand this case to the District Court to allow the federal appellees initially to make their own determination.

We find from the record from the District Court ample evidence suggesting that, as for two of the balancing factors, the time for a statement is indeed ripe. Meaningful information on the effects of development of coal resources in the Northern Great Plains, and of alternatives to that development, is certainly available, although not yet compiled and analyzed. Of course it is the mere availability of such information that matters; compilation and analysis are the purpose of the impact statement itself.[31] Likewise the severity of the environmental effects of massive coal development of the Northern Great Plains is clear and inclines us toward a finding of ripeness. There is no need to expound on the effects here.[32] Briefly put, a region best known for its abundant wildlife and fish, and for its beautiful scenery, a region isolated from urban America, sparsely populated and virtually unindustrialized, will be converted into a major industrial complex.

■ Weighing the other two balancing factors is not so clear-cut. While federal approval of development of the Northern Great Plains seems fairly certain to occur, and to occur in the relatively near future so as to lessen our dependence on imported oil, it seems to

---

31. The extreme importance of prompt analysis of the effects of massive coal development of the Northern Great Plains is emphasized by the NGPRP, which does not attempt to engage in such detailed analysis:

Considerable uncertainty remains regarding the socio-economic impacts of coal development in the Northern Great Plains. Because of the complex nature of coal development, it is extremely difficult to estimate or assess cumulative impacts. However, these impacts may be critical. Is the impact of two mines or powerplants in the same area twice as great as the impact of one, or is it larger?

Furthermore, how adaptable is the socio-economic environment? Do equal increments of change require equal adjustments or do they require successively more? It is quite possible that the impacts of coal development in the Northern Great Plains may be greater than· the projection and analytic techniques used have been able to delineate.

NGPRP Draft Interim Report, at V–2.

32. The effects are described vividly in appellants' brief, and we do not understand appellees to contest their magnitude. *See* appellants' brief at 11–18.

us clear that the Government has not yet finally settled on its role in granting that approval. Significantly, the relevant geographic area for development still seems somewhat uncertain.[33] Interior's broadly conceived North Central Power Study collapsed, and it responded with the Northern Great Plains Resources Program. While the NGPRP is intended to guide the Government in controlling private development of the Region, the interim report is not yet completed. As the Government grapples with its role in the Northern Great Plains, it has largely suspended activity therein. Thus so long as the suspension stays in effect, irretrievable commitments are largely being avoided while appellees determine the scope of the proposed federal action.[34] On the other hand, the suspension is not absolute; four mining plans have been approved in the past two years and four more are

ready for approval, stayed only by our temporary injunction.

Thus analysis of the four balancing factors is somewhat inconclusive, inclining us simultaneously toward a finding of ripeness and a desire to stay our hand while appellees further define their roles. However, we find it unnecessary to reach a conclusive resolution of the question at this time, for the uncertainties inclining us toward restraint are about to be resolved. We are told that the final interim report of the NGPRP is about to be issued; indeed, it may have issued already. According to the federal appellees, they will then feel free to begin approving private activity in the Northern Great Plains. We think the federal appellees will also be in a position, upon issuance of the interim report, to decide more definitely upon their role in the development of the Northern Great Plains,[35] and we think we should

33. Thus, while the NGPRP covers the five states of Montana, Wyoming, North Dakota, South Dakota, and Nebraska, its projected development of the area covers only northeastern Wyoming, eastern Montana, and the western Dakotas. See, e. g., NGPRP Draft Interim Report, Plate 5B, Most Probable Development Forcast [sic]. The North Central Power Study, on the other hand, encompassed a significantly larger area, while the Aqueduct Study covers only Montana and Wyoming. We think that, absent abuse of this power, definition of the proper region for comprehensive development and, therefore, the comprehensive impact statement should be left in the hands of the federal appellees.

The appellees make something of an issue of the differences between the area covered by the NGPRP and the area described by appellants in their complaint. Intervenor appellees' brief at 23–24, 43–45; federal appellees' brief at 4 n.1. The District Court also found significance in these discrepancies, ruling:

The "Northern Great Plains region" as described by the plaintiffs is not an entity, region, or area which has been defined by the Federal Government by statute or executive action for purposes of any Federal program, project, or action.

Fdg. 7, App. 235 (emphasis added). We find this argument to be without merit. In a case such as this, where appellants seek to have the Government acknowledge that it is treating the comprehensive development of a region as a whole, we deem it unnecessary for the complaint to define every acre of territory within

the region being so treated by the Government. Precise definition of the region is one of the consequences of such a lawsuit, not a prerequisite for it. The complaint should be sufficiently precise to put the Government on notice of the scope of plaintiff's claim. That was clearly achieved here; indeed, the planning maps of the NGPRP released after initiation of this suit revealed the area defined by the appellants to describe virtually precisely the area actually considered for development by the NGPRP.

34. It is the lack of definition of the proposal for action and the suspension of activity in the region that crucially distinguish this case from Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra note 28, see supra, 169 U.S.App.D.C. at —————, 514 F.2d at 873–874. In Conservation Society the scope of the proposed action was clear—the entire 280-mile length of Route 7—and irretrievable commitments—the 20-mile segment under construction—were being made that would determine the course of future action. Thus the proposal was sufficiently ripe to demand preparation of a comprehensive impact statement.

35. It is admitted that the federal appellees intend to use the NGPRP to help define the need and scope of future impact statements in the Northern Great Plains. Supp. Fdg. 6.

The fact that appellees' plans to control development of the Northern Great Plains may not spring full-blown from issuance of the NGPRP interim report is, of course, of no con-

await their definition. If, as has been their goal, that role is one of controlling development of the region, then, as we have made clear above, a comprehensive EIS should accompany the proposal for action, which presumably would be embodied in a final NGPRP report.[36] If, contrary to expectations, the federal appellees settle upon another role in the development of the Northern Great Plains, or upon no role at all, they must decide whether an impact statement is required.[37] If they decide in the negative, we will require "a statement of reasons why [they believe] that an impact statement is unnecessary."[38] Arizona Public Service Co. v. FPC, 157 U.S.App. D.C. 272, 279, 483 F.2d 1275, 1282 (1973). See also SIPI, supra, 156 U.S.App.D.C. at 410–411, 481 F.2d at 1094–1095; Hanly v. Kleindienst, 2 Cir., 471 F.2d 823

(1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). Accordingly, we remand this case to the District Court. The federal appellees must decide within 30 days of issuance of the NGPRP Interim Report, or the date of this opinion, whichever is later,[39] whether to prepare a comprehensive, programmatic impact statement for the Region, and they must report their decision, and the reasons for it, to the District Court.[40] If appellees decide against attempting to control development of the Northern Great Plains, they must also report, in detail, what the federal role in the Region will be. See Arizona Public Service Co. v. FPC, supra, 157 U.S.App.D.C. at 280, 483 F.2d at 1282. Appellants will be able to challenge appellees' impact statement decision and, if appellees decide not to prepare a comprehensive statement,

sequence. The impact statement is intended to aid agency planning and decision-making before the final recommended proposal for action is made. It is enough that the scope of the proposal is sufficiently clear that consideration of its environmental impact is possible.

36. If the federal appellees decide to prepare a comprehensive regional EIS for the Northern Great Plains, it is, of course, of no consequence to us what form it takes. The EIS may be incorporated in already planned statements for individual projects, it may be subdivided into subregional statements, or it may be issued as a whole. All that matters is that a comprehensive study of the region is made. SIPI, supra note 15, 156 U.S.App.D.C. at 408–409, 481 F.2d at 1092–1093; Natural Resources Defense Council v. Morton, D.D.C., 388 F.Supp. 829 (1974). See notes 15 & 23 supra.

It is likewise of no concern whether the appellees jointly prepare a comprehensive statement or whether they each prepare their own, so long as the cumulative effects of all the contested federal actions are fully assessed.

37. We note that an impact statement might be required for the negative decision not to control development of the Northern Great Plains, as well as for the positive decision to do so. See Arizona Public Service Co. v. FPC, 157 U.S.App.D.C. 272, 280 n.24, 483 F.2d 1275, 1282 n.24 (1973); City of New York v. United States, E.D.N.Y., 337 F.Supp. 150, 160 (1972) (three-judge court) (Friendly, J.).

38. While we will allow the federal appellees, in the first instance, to make the decision whether a regional impact statement is necessary for

the Northern Great Plains, we remind them that the requirements that such a statement issue for major federal action, even if regional in character, and that environmental factors be considered at every stage of agency decision-making about such action are not inherently flexible or discretionary. See Calvert Cliffs' Coordinating Committee v. AEC, supra note 25, 146 U.S.App.D.C. at 38, 449 F.2d at 1114. But see note 36 supra.

39. Should, for some reason, the NGPRP interim report not issue within a reasonable time after the date of this opinion, appellants may petition this court for a further order.

40. Secretary Morton seems to have conceded that some sort of regional or subregional statement will be necessary.

It is possible a decision will be made to prepare a statement for the entire Northern Great Plains region, but information available may indicate that statements on smaller subregions, geologic structures, basins or selected individual actions will fulfill the policy and procedural requirements of the National Environmental Policy Act in a more satisfactory manner. Until those decisions are reached no new coal leases will be issued except pursuant to the short-term leasing policy. The interim report from the NGPRP * * * will provide an informational foundation for decision-making and planning.

Affidavit of Secretary Morton, App. 194–195. We agree that the NGPRP will provide a basis for making the decision whether to prepare a comprehensive impact statement for the Northern Great Plains. We only order that the Secretary, guided by our interpretation of the procedural and policy requirements of NEPA, make that decision.

to present again to the District Court their theory that the geographic, environmental, and/or programmatic interrelationship of activity in the Region mandates such a statement.

## V

Since we refer back to appellees the decision whether to prepare a comprehensive impact statement for the Northern Great Plains, we continue our temporary injunction of January 3, 1975 until that decision is reached. This will preserve, in large part, the *status quo* pending appellees' decision. While we do not order issuance of any more comprehensive injunction at this time, we note that our decision to refer the issue of a regional EIS to appellees for resolution in the first instance is prompted in large part by appellees' forbearance in authorizing activity in the Region pending issuance of the NGPRP. In this regard, we have two observations. First, while Interior's interim policy seems to have been embarked upon with considerable good faith, we would have more confidence in it if the escape hatch were not quite so large. As matters stand, requests for approval of any activity within Interior's jurisdiction in the Northern Great Plains

> will be held in abeyance pending the availability and analysis of the interim report from the NGPRP study *or submitted to the Under Secretary for review and concurrence prior to execution.*

Affidavit of Secretary Morton, App. 194 (emphasis added). No standards at all are suggested by which the Under Secretary will grant his concurrence. We think it would be appropriate, particularly if this policy were to continue following a decision to prepare a comprehensive impact statement, for the Secretary to determine and publish standards by

which this significant exception will operate. Moreover, the remaining federal appellees' policy of forbearance seems to have dissolved, although they have actually approved few actions in the Region. *See supra,* 169 U.S.App.D.C. at ———— ———, 514 F.2d at 864–865. We think it would be appropriate for these appellees to adopt a policy similar to Interior's.

Second, as we noted in denying appellants' motion for a preliminary injunction last spring, the spectre of significant, and unnecessary, harm to large tracts of valuable wilderness still remains. The number of applications for federal approval of various activities is large. We urge appellees, while deciding whether to prepare a comprehensive impact statement for the Northern Great Plains, to take no actions that would defeat the purpose the impact statement is designed to serve. Needless to say, however, the courts remain open, to appellants or others, should the federal appellees decide nonetheless to approve any private endeavors in the Northern Great Plains.

Whether an injunction against activity, either ongoing or proposed, in the Northern Great Plains should issue pending preparation of a comprehensive regional impact statement is a question we need not reach.[41] We note only that a responsible policy of restraint by the federal appellees with respect to authorizing such activity might make the question moot.

## VI

This case has presented difficult questions involving the proper balance between an agency's discretion in deciding whether, and when, to issue an environmental impact statement, and the judiciary's role in overseeing exercise of that discretion. We believe that, to the full-

---

41. The District Court concluded that even if a regional impact statement were required appellants had shown no irreparable harm that would justify an injunction barring activity in the region until the statement were completed. Concl. 11, App. 248. In this regard, we direct the court's attention to this court's recent decision in Jones v. District of Columbia Redevelopment Agency, 162 U.S.App.D.C. 366, 376, 499 F.2d 502, 512 (1974), which makes clear that the harm to be considered in issuing an injunction in NEPA cases matures at the time an impact statement becomes necessary but is not filed.

est extent possible, it is for the agency to implement the demands of NEPA. While the courts should not shirk their role, it is the responsible compliance of the federal agencies that will make environmental planning a day-to-day occurrence and that will make the needless abuse of our priceless national heritage a nightmare of the past. We are confident the agencies will not lose, or misuse, this opportunity.

Reversed and remanded.

MacKINNON, Circuit Judge (dissenting):

In the foregoing opinion, the majority has remanded this case with instructions that it be held in abeyance pending the issuance of a "study" presently being prepared by the Federal appellees. It is anticipated that the release of the study will enable the various agencies involved to decide within 30 days thereafter whether "a comprehensive, programmatic impact statement for the Region"[1] is necessary. Since I conclude that a regional environmental impact statement (EIS) is not presently required in these circumstances, I find no need to remand the case for further proceedings and accordingly dissent from the action of the majority.

The only immediate practical effect of the majority's decision is to continue the temporary injunction as ordered by this court on January 3, 1975, in order to "preserve . . . the status quo."[2] My objections to the continuance of this injunction are the same as were indicated in my dissent to the original order. See Sierra Club v. Morton, 167 U.S.App. D.C. 756, 509 F.2d 533, 534–36 (1975).

I

The trial court concluded that appellants' complaint failed to present a justiciable case of controversy because

the courts will not review the validity of supporting statements or studies until final federal actions [are] taken under NEPA section 102(2) and until after final agency action has been taken with respect to the individual project.[3]

While the majority concedes that "as a general proposition of law NEPA challenges to individual projects can be brought only after final agency approval of a project," it interprets Scientists' Institute for Public Information, Inc. v. AEC (SIPI), 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973), as holding that a challenge to a comprehensive program need not be made through an attack on an individual project.[4] As indicated hereafter, the record in this case does not establish the existence of any comprehensive regional program of the type found in SIPI which could justify requiring the preparation of a regional environmental impact statement at this time. However, even if one concedes that such a statement might be appropriate, the District Court was still correct in concluding that an action divorced from the review of a statement covering an individual project is not a proper means for the determination of appellants' claims.

In deciding that the instant case is a proper vehicle for raising a claim for a regional EIS, the majority has overlooked the required relationship between the statements prepared on individual projects and the "regional" statement appellants seek. If appellants are cor-

1. Majority Op. 169 U.S.App.D.C. at ——, 514 F.2d at 883.

2. Id. 169 U.S.App.D.C. at ——, 514 F.2d at 883.

3. Conclusions of Law, ¶ 7, App. 247, citing Scientists' Institute for Pub. Info. v. AEC, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1091 (1973); Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972);

Coalition for Safe Nuclear Power v. AEC, 150 U.S.App.D.C. 118, 463 F.2d 954, 955 (1972); Thermal Ecology Must Be Preserved v. AEC, 139 U.S.App.D.C. 366, 433 F.2d 524, 526 (1970); Gage v. Commonwealth Edison Co., 356 F.Supp. 80, 86 (N.D.Ill.1972); Sherry v. Algonquin Gas, 4 ERC 1713, 1714 (D.Mass. 1972).

4. Majority Op. at n. 20.

rect in asserting that NEPA requires the preparation of a regional EIS before any development of the Northern Great Plains may proceed, then all the statements covering individual projects necessarily must be at present insufficient to comply with NEPA. Conversely, if an EIS on an individual project is found to comply with NEPA, it necessarily follows that NEPA does not require the preparation of a more comprehensive statement before that project may proceed.

Impact statements have already been issued for the Westmoreland mine, the Peabody Coal Company project, and four mines and a railroad right-of-way in the Eastern Powder River Basin. See Supp. Finding on Remand, ¶ 9a. Of these, the Westmoreland EIS was found to be sufficient under NEPA in Redding v. Morton, Civ. No. 74–12–BLG (D.Mont., May 1, 1974), appeal pending, 9th Cir. No. 74–1984, and the remaining statements apparently have not yet been challenged in court.[5] My dissent to the issuance of the temporary injunction states, and I continue to believe, that the proper method to use in assessing the need for a regional statement is for appellants to file an appeal challenging the sufficiency of the EIS covering an individual project.[6] Appellants' apparent inability to successfully challenge the statements on individual projects as too limited in scope is strong, if not compelling, evidence that a "comprehensive regional EIS" is not required at this time.

## II

The starting point for any discussion of the need for an environmental impact statement is of course section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C):

(2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The crucial question here is whether the Federal appellees have "proposed" "major federal actions" which require the preparation of an EIS covering all coal-related development in the "Northern Great Plains Region."[7]

5. Appellants' argument that it would be "inconvenient" for them to attack specific federal actions does not merit serious consideration by this court.

6. The majority asserts:

There has been no contention that any of these individual statements comprehensively study the regional impact of coal development in the Northern Great Plains, and our examination of the statements makes it clear that they do not do so.

Majority Op. at n. 15. However, the real question in this case is whether such a comprehensive study is necessary here. As here indicated, this is merely another form of the inquiry into the sufficiency of statements on individual projects. Since the sufficiency of the

individual statements was not litigated before the District Court, if the majority intended this statement as a finding based on its own examination that they are insufficient to support the projects they cover, it would be exceeding the permissible scope of appellate review.

7. Appellants' complaint described the area in issue as "northeastern Wyoming, eastern Montana, western North Dakota and western South Dakota." App. 2. By a stroke of luck, this vague "region" roughly conformed with the 63 county area which the Northern Great Plains Resources Program (NGPRP) study later identified as the area in which development was likely to occur. However, the conclusion that a region has potential for development is a far cry from a declaration that the federal

To place this case in perspective, it is important to keep in mind exactly what is not at issue. The federal appellees do not deny that they are taking actions related to coal development within this region. On the contrary, several projects are admitted to be in various stages of development, and the agencies have consistently prepared impact statements prior to taking action.[8] Nor is there any contention that the projects which have been approved or which may be approved in the future are not "major." Furthermore, the agencies have consistently required that the EIS on each project consider the cumulative environmental impacts of related developments.[9] Where appropriate, they have prepared impact statements which consider together several related developments within an area.[10]

government is undertaking a program of coordinated development of the region. The District Court correctly concluded:

The "Northern Great Plains region" as described by the plaintiffs is not an entity, region, or area which has been defined by the Federal Government by statute or executive action for purposes of any Federal program, project, or action.

Finding of Fact, ¶ 7, App. 235. Permitting appellants to define their own region for purposes of this action raises the clear possibility that other potential plaintiffs could seek an infinite progression of "regional" statements covering "regions" of their own choice, thus seriously disrupting any attempt by the federal appellees to deal with the development of a critical national resource. The majority recognizes the danger posed by its decision to allow appellants to maintain this action (Majority Op. 169 U.S.App.D.C. at ———, 514 F.2d at 874, 875) but declines to give the District Court any guidance on whether it must allow new plaintiffs to maintain suits seeking to compel, for example, the preparation of statements covering all coal deposits in the nation or covering a single Basin in the Northern Great Plains Province, both of which "regions" have also been the subject of various studies. This entire problem could be avoided simply by requiring appellants to challenge a particular federal action, thus enabling the court to evaluate the extent of the environmental impact from that action and define the region accordingly.

8. See, e. g., the impact statements prepared for the Westmoreland Resources and Peabody Coal Company mines.

9. The Preface to the Final Environmental Impact Statement on the Eastern Powder River Coal Basin, Vol. I, illustrates the considerations used by the federal appellees in determining the necessary scope of an EIS:

Further, to meet the intent of the Act in the most productive fashion, it is necessary to examine the general geographic area of the proposed and potential actions. The geographic area for basic consideration is that part of the Powder River Coal Basin in Wyoming lying generally eastward from the Powder River to the outcrop line of the coal resource and from somewhat north of Gillette to a point somewhat south of Douglas. The area delineation is based in part on present and anticipated levels of mining activity, differing quality of the coal resource, different physical arrangement of the coal beds, somewhat different mining techniques required and differing physical reclamation requirements. Those considerations having a broader scope of geographic impact such as social conditions, economic factors, atmospheric influence, water resources, and recreation uses are treated on a larger regional basis than the primary study area. This statement discusses the existing environment, evaluates the collective impact of the proposed actions and, insofar as now possible, the impacts of potential future coal mining within the geographic area described above. This statement also examines in detail certain proposed activities for which federal actions are required.

10. See, e. g., the Final Environmental Impact Statement for the Eastern Powder River Coal Basin, which covers four mines and an associated rail right-of-way. More recently, Interior has released a draft EIS for the Belle Ayr South Mine of the Amax Coal Company, also located in the Eastern Powder River Basin. The Preface to that document states:

In January 1974, the Departments of Interior and Agriculture and the Interstate Commerce Commission decided that, under provisions of Section 102 of the National Environmental Policy Act of 1969, an environmental impact statement must be prepared before any decision could be made on pending proposals for major development of federally-owned coal in the Eastern Powder River Basin of Wyoming. At that time, there were four major strip mine plans pending approval before the Department of the Interior. There was also pending before the Interstate Commerce Commission proposed construction of a railroad some 113 miles in length, between the Belle Ayr Mine spur southeast of Gillette, Wyoming, and Douglas, Wyoming. This railroad was to serve the coal mines proposed to be developed along the proposed right-of-way in the basin. The construction of this railroad line, the

What appellants present to this court is a claim that all these good faith efforts on the part of the various agencies are not sufficient to satisfy the demands of section 102(2)(C). To carry out the alleged requirements of NEPA, appellants assert that before any development in the region may be allowed to go forward, the agencies concerned must first prepare a "comprehensive" analysis of the environmental impacts of all present and potential development within the region.

### III

By reversing the decision of the District Court, the majority is indicating its belief that there is some substantial possibility that appellant's claims will ultimately be successful. To reach this conclusion, the opinion reasons that major federal actions can be combined to create a new major federal action for which an EIS is necessary. Its authority for this proposition is this court's decision in Scientists' Institute for Public Information, Inc. v. AEC (SIPI), 156 U.S.App. D.C. 395, 481 F.2d 1079 (1973) and the Second Circuit decision in Conservation Society of Southern Vermont, Inc. v.

Secretary of Transportation, 508 F.2d 927 (2d. Cir. 1974). There is no doubt SIPI holds that a comprehensive statement may be required in certain circumstances, but like any holding it is colored by its facts and its reasoning. The difficulty arises in the application of that decision to the facts here.

The crucial consideration which justified the requirement of a statement covering more than an individual project in both SIPI and Conservation Society was the presence of irretrievable commitments of resources beyond what was actually expended in an individual project. In SIPI, each development in the Liquid Metal Fast Breeder Reactor Program made it more unlikely that the agency could in the future abandon its investment in favor of some alternate energy source:

The manner in which we divide our limited research and development dollars today among various promising technologies in effect determines which technologies will be available, and what type and amount of environmental effects will have to be endured, in the future when we must

---

four mining proposals, as well as a number of other anticipated or possible future coal-related developments and all their impacts on the environment, were evaluated in an environmental impact statement entitled "Proposed Development of Coal Resources in the Eastern Powder River Basin of Wyoming." The final statement was filed with the Council on Environmental Quality by the Department of the Interior on October 18, 1974.

Part I of that final environmental impact statement (hereinafter designated FES 74–55) was devoted to a regional analysis encompassing the existing environment, all projected coal development and the cumulative effect of this development on the environment. Parts II through VI of the FES specifically dealt with the four mine plans and the construction of the railroad.

Due to the increased nationwide demand for low sulphur coal for the generation of electricity, it was anticipated that a number of large strip coal mines, in addition to those four mines considered in Parts III through VI of FES 74–55, would also be proposed for development of Federal coal leases in the near future in the Eastern Powder River

Coal Basin. Accordingly, the regional analysis of FES 74–55 included data and information from every proposed operation known to be under consideration by the various leaseholders in the study area. In this way the cumulative impacts of the total potential development could be assessed. Subsequent to initiation of preparatory efforts for FES 74–55 and prior to its filing in final form, other proposed mining and reclamation plans for development of existing Federal coal leases in the area were filed for approval with the Geological Survey, Department of the Interior, as required by law.

Because of the submission date, these plans could not be included for site specific analyses in FES 74–55. In the assessment which follows, the site specific aspects of the proposed mining and reclamation plans for the South Belle Ayr Mine of the Amax Coal Company, are analyzed using information and data previously published in FES 74–55 together with information gained from field observations and company reports. Part I of FES 74–55 is incorporated herein by reference.

apply some new technology to meet projected energy demand. 481 F.2d at 1090. Similarly, the court found in *Conservation Society* that the construction of a 20-mile segment of highway would generate traffic and thus create pressure for further construction along the entire route and foreclose consideration of alternatives to highways.

Phrasing these decisions in terms of the potential "regional" development at issue in the instant case, it is clear that the courts in *SIPI* and *Conservation Society* found that a federal action at one point in the "region" would cause a ripple effect which would eventually have an impact on future federal actions elsewhere in the "region." Because of this effect, each court determined that the agency involved was required to prepare a comprehensive statement for the entire "region" before it could approve an individual project within the "region."

The reason for the above holdings becomes clear when one considers the purpose underlying the preparation of impact statements. Virtually every federal action "significantly affecting the quality of the human environment" will necessarily involve some irreversible and irretrievable commitment of resources. NEPA only requires that the agency disclose these environmental costs and consider them in arriving at a decision; it does not prevent an agency from proceeding with a project if the benefits outweigh the costs disclosed in the EIS. Thus where the only irretrievable commitments of resources are those directly associated with an individual project, an impact statement covering that project is sufficient to enable the agency to act. However, in situations where the deci-

sion on one federal project was found to presently cause irretrievable commitments on future projects or the foreclosure of future options, this court and the Second Circuit quite properly found that an EIS for the entire project was necessary before the initial step could be taken.[11]

Applying the above analysis, the instant case is readily distinguishable from both *SIPI* and *Conservation Society*. Any coal-related federal action will undoubtedly require certain associated developments. For example, the approval of a mining plan will most probably require the granting of rail rights-of-way and the construction of housing facilities for mine employees. However, these are direct consequences of the initial action, and the agencies involved have always taken the position that such impacts must be considered in the EIS which precedes approval of the mining plan. This record is devoid of the type of commitment of "regional" resources which justified the results in *SIPI* and *Conservation Society*. Developments in one part of the Northern Great Plains are essentially independent from developments elsewhere in the region. For example, the decision to permit mining of sub-bituminous coal in Wyoming, to which the Federal Government has the mineral rights, in no way commits Interior to approving proposals for mining lignite, similarly owned by the United States, in North Dakota. Even within each of the Basins which comprise the Region, development of some portion of the coal reserves does not irretrievably commit the federal agencies to permit development of the entire reserve. Furthermore, it is clear that even the larg-

11. The Ninth Circuit recently arrived at a similar interpretation of *SIPI*:

Nor is Scientists' Institute for Public Information v. Atomic Energy Comm'n, 156 U.S. App.D.C. 395, 481 F.2d 1079 (1973) particularly pertinent here. There an EIS was required for continued research and development on the AEC's Liquified Metal Fast Breeder Reactor (LMFBR) Program covering foreseeable environmental effects if such a reactor were put into future use. The

LMFBR has no independent significance absent such future uses. The court was careful to emphasize that its decision to require an EIS was based in large part upon the significance of the overall reactor program as a radical change in the manner in which the entire nation produces electricity. *See* 481 F.2d at 1089.

Trout Unlimited v. Morton, 509 F.2d 1276, 1285 n. 13 (9th Cir. 1974).

est of the proposed projects will not have an environmental impact on the entire Northern Great Plains Region. It may indeed be the case that widespread development of this area will eventually occur, but the impetus for that development will come from the nation's need for coal and not from the fact that partial development of the region has been allowed.[12]

## IV

If *SIPI* and *Conservation Society* were the only relevant decisions, the majority's arguments might have some appearance of validity. However, several courts have considered arguments such as those advanced by appellants, in cases which presented facts that were considerably closer to the instant case than *SIPI* and *Conservation Society*, and have determined that a "regional" EIS was unnecessary before individual projects within the "region" could be approved. See Trout Unlimited v. Morton, 509 F.2d 1276 (9th Cir. 1974); Sierra Club v. Stamm, 507 F.2d 788 (10th Cir. 1974); Sierra Club v. Callaway, 499 F.2d 982 (5th Cir. 1974); Environmental Defense Fund v. Armstrong, 356 F.Supp. 131 (N.D.Cal.), aff'd, 487 F.2d 814 (9th Cir. 1973); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973); Movement Against Destruction v. Volpe, 361 F.Supp. 1360 (D.Md.1973).

In its attempt to evade the clear holdings of these cases, the majority dismisses them with the assertion that:

Every cited case involved the propriety of an injunction against an individual project pending completion of a regional EIS or other study. None of the cases involved a direct challenge to the need for a regional EIS.

Majority Op. at n. 29. This is a classic example of a distinction without a difference. Surely, it is not reasonable to suggest that the decisions reached by other courts are somehow less sound because they were able to assess the need for a regional EIS in the context of a challenge to the sufficiency of a specific statement whereas this court is considering a challenge in the abstract without ever determining that a particular EIS does not comply with the dictates of NEPA. If any inference can be drawn from the majority's distinction, it would be that the cited cases are entitled to considerably more weight than this court's decision in the instant case.

In *Jicarilla, supra*, the court rejected contentions that impact statements issued in connection with each of several coal-fired electric generating projects in four southwestern states violated NEPA because they were issued prior to the completion of a Southwest Energy Study by the Interior Department. The majority is correct in pointing out that the plaintiffs in *Jicarilla* were specifically seeking delay pending the completion of a "study" rather than delay pending the preparation of a regional EIS, but rather than forming the basis of a distinction, this fact emphasizes its similarity to the instant case. The Southwest Energy

12. The Majority Opinion at n. 28 cites two "examples" of how it contends the various present and potential developments are interrelated—the availability of water supplies and manpower resources in the region. Actually, the use of the term "manpower" is a misnomer since what the majority is really talking about is the pressure of the influx of necessary additional manpower on the area. Insofar as one mine creates pressure for a population influx, that is just one more factor to be considered in the EIS for that particular project. However, the opening of that mine in no way commits the agencies to authorizing other mines which would require the importation of additional manpower not already in the area at a future date. With respect to water

resources, there is no showing here that the strip mines, which presently are the only projects actively being developed, have sufficient impact on regional water resources to foreclose future alternatives. The proper time to consider such problems will be when the agencies move to a proposed type of development which does tax regional resources. If there is insufficient water for a particular type operation, then that type operation would not be used. In any event, this entire discussion points up the importance of appellants' failure to show at any point in this record that the EIS on any particular project has failed to adequately consider all relevant environmental impacts.

Study "was designed to evaluate the problems created by further development of coal-fired electric power in the Southwest;" (471 F.2d at 1279), a purpose quite similar to that of the Northern Great Plains Resources Program study. The Majority opinion at this point apparently overlooks the fact that its opinion ultimately does *not* direct the preparation of a regional EIS for the Northern Great Plains but rather just arrests development within the region until the study issues, at which point the need for a regional EIS would be assessed. The Ninth Circuit found that this sort of delay was not mandated by NEPA, and my conclusion on the facts of this case is to the same effect.

In Environmental Defense Fund v. Armstrong, *supra*, the Ninth Circuit affirmed a District Court decision rejecting an argument that an EIS covering the New Melones Dam project was inadequate because it did not include a "comprehensive study" covering the entire California Central Valley Project. Although the plaintiffs once again requested only a study and not a regional EIS, the language of the District Court is instructive:

> Under these circumstances there is no requirement under NEPA that the EIS with respect to the New Melones Project be delayed until a comprehensive study of the Central Valley Project be completed. So long as each major federal action is undertaken individually and not as an indivisible, integral part of an integrated state-wide system, then the requirements of NEPA are determined on an individual major federal action basis. Plaintiffs' suggestion that there is need for a comprehensive study of the Central Valley Project should be made to the Congress, and not to the Court.

356 F.Supp. at 139. As is stated above, the federal actions related to coal development in the Northern Great Plains fall largely into this same category. The majority notes that the court in *Armstrong* refused to wait for the study because no comprehensive study had been commenced, and therefore finds the case to be in sharp contrast to the instant case where the NGPRP Study is under way. It is revealing, however, that the majority does *not* find this fact to be of significance in its discussion of *Jicarilla* where the Southwest Energy Study had been released by the time the case was decided.

The remaining cases cited on *supra*, 169 U.S.App.D.C. at —, 514 F.2d at 889, involved demands that a comprehensive EIS be prepared prior to the approval of individual projects and thus are squarely on point with the instant case. In Sierra Club v. Callaway, *supra*, the Fifth Circuit reversed a District Court decision which had ordered that construction of the Wallisville Reservoir project be held up pending the preparation of an EIS covering the entire Trinity Basin project. The court held:

> We conclude that the Wallisville and Trinity River Projects are not interdependent. The nexus between the projects is not such as to require an EIS evaluation of the Trinity Project as a condition precedent to an EIS evaluation of Wallisville. The Wallisville EIS should speak for itself. Wallisvlle is a separate viable entity. It should be examined on its own merits. Although it has been made compatible in certain of its features with Trinity it is not a mere component, increment, or first segment of Trinity. The court erred in so holding.

499 F.2d at 990. Faced with a similar situation, the Tenth Circuit reached the same conclusion in Sierra Club v. Stamm, *supra*. There the plaintiffs attacked the final EIS for the Strawberry Aqueduct and Collection System, a subunit of the larger Bonneville Unit which was in turn a part of the Central Utah Project, because *inter alia*:

> (1) The Statement is too narrow in its scope and should include the cumulative and collective environmental impact of the entire Central Utah Project; (2) the Statement is incomplete in that it is a *final* statement as

to the Strawberry Collection System only, and that it should, but does not, encompass all increments of the Bonneville Unit; . . . .

507 F.2d at 790. Relying on *Callaway* and *Armstrong*, the court concluded:

> In sum, then, we agree with the trial court that the Strawberry system in and of itself constitutes a "major Federal action" and that it is not a mere increment of either the Bonneville Unit or the Central Utah Project requiring a final impact statement for something more than the Strawberry system before work may be commenced on the Currant Creek Dam.

507 F.2d at 792–93. Thus both the Tenth and Fifth Circuits decided cases against the Sierra Club on the same grounds that they assert here.

In its most recent decision on this subject, the Ninth Circuit once again rejected claims that an EIS of larger scope was required by NEPA. The Teton Dam and Reservoir project had been divided into two phases. In Trout Unlimited v. Morton, *supra*, the plaintiffs argued that the EIS prepared for the initial phase was fatally inadequate because it did not discuss the environmental impact of the Second Phase. After considering the cases relied upon by the majority here,[13] the court concluded:

> The distinction between those situations in which it has been held that the EIS must cover subsequent phases and that before us is that here the First Phase is substantially independent of the Second while in those in which the EIS must extend beyond the current project, that project was dependent on subsequent phases. The dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken. This is not the case here.

509 F.2d at 1285 (footnote omitted).

The majority attempts to evade the fact that its decision is contrary to the clear weight of authority elsewhere in the federal courts of the nation by arguing that each of the foregoing decisions involved a "crucial dependence upon the facts."[14] Obviously all judicial decisions turn on the facts which are presented to the court, but the majority has failed to offer any convincing explanation as to why the facts of the instant case, which present the same situations as the facts in the cases cited above, require a different result.

The regional water projects involved in *Callaway, Stamm* and *Trout Unlimited* had certainly progressed to the point where the federal agencies involved had concrete notions as to the ultimate scope of regional development, yet the court in each case found it unnecessary to prepare a regional EIS before acting on the initial phases of the development. In contrast, even if we ignore the statements by the federal appellees that there is at present no overall coordinated program for the development of coal resources in the Northern Great Plains, appellants have failed to establish that planning has progressed to the point where some proposal for major *regional* federal action exists which could be the subject of a regional EIS.

Furthermore, although there are undoubtedly some interrelationships between development projects along the course of a single river or in a single watershed basin, the Fifth, Ninth and Tenth Circuits were still able to find the projects sufficiently independent to render a more comprehensive EIS unnecessary. The potential development of the Northern Great Plains lacks even this slight relationship between projects. Appellants, at a time of great need for new energy sources, are seeking to halt development of three grades of coal deposits distributed through four states

---

**13.** The court discussed *SIPI* and Thompson v. Fugate, 347 F.Supp. 120 (D.Conn.1972) and Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167 (S.D.Iowa 1972), modified, 484 F.2d 11 (8th Cir. 1973). The latter two cases involved

attacks on impact statements covering segments of highway and thus presented issues similar to *Conservation Society*.

**14.** Majority Op. at n. 29.

and involving nine federal agencies and at least fifteen different forms of "federal action." Clearly the developments projected for this Region by appellants themselves do not have even the minimal interrelationships one might have expected to find in *Callaway, Stamm* or *Trout Unlimited.*

V

The majority is to be credited for perceiving the "practical difficulties" inherent in appellants' contention that NEPA allows the courts to impose upon the Government the duty to plan comprehensively.[15] Truly, such an interpretation could result in the generation of an infinite progression of comprehensive plans which would have to be justified by comprehensive impact statements. It seems obvious that NEPA was enacted as a means of facilitating agency decision making and not as a means of paralyzing the federal government. However, I am concerned that rather than nipping such fallacious notions in the bud, the majority attempts to demonstrate that appellants' arguments have a legal basis.[16] Although its dicta is constructed on prior dicta and on CEQ Guidelines of questionable force as legal authority, it has laid the groundwork for the perpetuation of this erroneous and impractical position in future cases.

From its review of the record, the majority finds "overwhelming" evidence that "the federal appellees have for years been endeavoring to develop a plan for regional development of the coal resources in the Northern Great Plains." [17] However, the most remarkable thing about the first two such "endeavors" was the fact that they collapsed without producing any plan for regional development. The only currently pending activity which could lead to the "regional plan" anticipated by the majority is the Northern Great Plains Resources Pro-

gram Study, but there is no assurance at present that it will be any more successful than the earlier studies. Furthermore, the Study was *never intended* to produce a comprehensive regional plan for coal development. The Draft Interim Report states:

> The primary objective of the Northern Great Plains Resource Program is to provide information and a comprehensive analysis that can be used to place the potential impacts of coal development into perspective and thereby assist the people of the Northern Great plains and the Nation in the management of the natural and human resources of this region.

> . . . . .

> *The three coal development profiles do not represent plans for development,* but are instead tools designed to help measure what the effects may be at different rates of development.

Northern Great Plains Resource Program, Draft Report, Sept. 1974, I–4,5 (emphasis in original). Not only is the Study insufficient to be viewed as a regional EIS, as the majority correctly notes,[18] its issuance will probably add little to this court's ability to determine the need for a regional EIS if on remand the federal appellees adhere to their position that they have not yet adopted or proposed a regional development program.

Since review of the record and consideration of those cases which have dealt with claims for the preparation of more "comprehensive" impact statements lead me to agree with the District Court [19] that NEPA does not require the preparation of an EIS covering all coal-related development in the entire Northern Great Plains at this time, there is no need to remand this case for further proceedings. Nor is there any justification

---

**15.** Majority Op. 169 U.S.App.D.C. at ——–——, 514 F.2d at 874–875.

**16.** *Id.* 169 U.S.App.D.C. at ——–——, 514 F.2d at 873–875.

**17.** *Id.* 169 U.S.App.D.C. at ——, 514 F.2d at 875.

**18.** *Id.* 169 U.S.App.D.C. at ——, 514 F.2d at 877–878.

**19.** *See* Conclusions of Law, ¶ 6, App. 247.

in further delaying projects which are already supported by impact statements through continuation of this court's temporary injunction.

If appellants believe at some point that an EIS issued in support of federal action on a particular project fails to adequately consider all reasonably related environmental impacts, they can challenge that project under the normal procedure for judicial review of impact statements. Furthermore, in the event the various agencies take concrete steps toward the establishment of a federally coordinated program of regional development, appellants will of course be able to bring their suit if the agencies take a

"major federal action" to implement that program without the preparation of the necessary impact statements.[20]

While the majority's attempt to force the federal government to engage in comprehensive long-range planning might in some sense be socially "good," the question before this court is not what the agencies "ought to" do but rather what NEPA requires that they do. To my mind it clearly does not require or authorize the continuance of the temporary injunction to hold federal agencies in check because the majority are suspicious of what the federal agencies might do. I accordingly respectfully dissent.

20. The majority's suggestion that the agencies might be required to prepare an impact statement or a statement of reasons to justify why they are *not* taking major federal action to control development of the Northern Great Plains (Majority Op. 169 U.S.App.D.C. at ——, 514 F.2d at 881–882 and n. 37) is clearly not consistent with the provisions of NEPA. Despite the current size of the federal bureaucracy, the realm of things the

federal government does *not* do is still rather large. A good many of these inactions undoubtedly have an impact on the environment, but it is difficult to see how any agency would be able to produce this nearly infinite number of "negative" impact statements and still carry out its assigned functions. In any event, NEPA clearly limits the requirement for preparation of impact statements to "proposals for . . . major federal *actions.*"